872 F.2d 1132
 14 Fed.R.Serv.3d 296
 J. Richard KNOP, Appellant in No. 88-1557
v.
D. Bruce McMAHAN, Milton Brafman, James Russell, Victor M.
Wexler and Coalair Systems Limited Partnership, Appellees.
J. Richard KNOP
v.
D. Bruce McMAHAN, Milton Brafman, James Russell, Victor M.
Wexler and Coalair Systems Limited Partnership.
Appeal of COALAIR SYSTEMS LIMITED PARTNERSHIP, Appellant in
 No. 88-1574.
 Nos. 88-1557, 88-1574.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 15, 1988.
Decided April 19, 1989.
Rehearing and Rehearing In Banc Denied May 17, 1989.
 
 Frederick J. Killion (argued), Bishop, Cook, Purcell & Reynolds, Washington, D.C., for J. Richard Knop.
 Deborah E. Lans (argued), Morrison, Cohen & Singer, New York City, for D. Bruce McMahan, Milton Brafman, James Russell, Victor M. Wexler and Coalair Systems Ltd. Partnership.
 Before GIBBONS, Chief Judge, HUTCHINSON, Circuit Judge and GERRY, District Judge.*
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 I.
 
 1
 J. Richard Knop (Knop) appeals from a final judgment of the United States District Court for the Eastern District of Pennsylvania entered in favor of CoalAir Systems, Ltd. (CoalAir) on its counterclaim for damages in connection with the circumstances surrounding the sale of land in Donaldson, Pennsylvania (Donaldson property), to D. Bruce McMahan (McMahan) and the other individual defendants.[1] The individual defendants formed CoalAir for the purpose of carrying on a prototype coal processing operation on the Donaldson property and transferred their rights in it to the CoalAir Systems limited partnership upon its formation. CoalAir cross-appeals from the district court's denial of prejudgment interest on its claim. We must first consider the issue of whether subject matter jurisdiction existed in the district court, since there was not complete diversity of citizenship between the parties at the time of removal from the state court. However, because there was complete diversity during trial and at entry of judgment, we hold that the district court had subject matter jurisdiction in this case. We have appellate jurisdiction over the final order dismissing Knop's claims and entering judgment for CoalAir on its counterclaim under 28 U.S.C.A. Sec. 1291 (West Supp.1988). On the merits, Knop argues that CoalAir (1) failed to show fraud in the transaction; (2) failed to show breach of contract in the transaction; (3) had no legal right to pursue either a fraud or breach of contract action against Knop; (4) was unjustly enriched by the transaction; and (5) that the damages awarded it were excessive. We will affirm the district court on all of these issues. On cross-appeal, CoalAir argues that it is entitled to prejudgment interest as a matter of law. We agree and will reverse the district court's order denying prejudgment interest and remand for its determination.
 
 II. FACTS
 
 2
 The Donaldson real estate, along with personal property used there, was acquired by A & T Associates, Inc. (A & T) in 1980 or 1981. A & T was a wholly-owned subsidiary of AOV Industries, Inc. (AOV), a corporation controlled by Knop, a citizen of Virginia, and Mark Bruce, Knop's brother-in-law. AOV and A & T instituted Chapter 11 bankruptcy proceedings in November, 1981. Because Knop and Bruce had personally guaranteed an A & T debt of about $1,500,000 to the Hamilton Bank, the bank began proceedings against them.[2]
 
 
 3
 In 1982, Knop became interested in a project called "Low Pressure Systems," or LPS, technology, a pneumatic pumping device for the transportation and processing of various materials, including coal. Exclusive rights to the technology were held by two affiliated companies, Air Trans Systems (ATS), and World Industry Consultants, Ltd. (WIC), both owned by Bill Lovejoy, the inventor of the technology, and Vern Green. Because Knop was familiar with the local anthracite industry, Lovejoy and Knop formed a 50-50 joint venture called CoalTec Systems Corporation (CoalTec). Half of CoalTec was controlled by Potomac Energy Corporation (Potomac), owned principally by Knop and Frank Evans, and half by ATS, owned principally by Lovejoy and Green. The officers of CoalTec at its formation were Knop (President), Evans (Executive Vice-President), and Green (Secretary-Treasurer). The four principal shareholders of CoalTec were also on the Board of Directors.
 
 
 4
 In the fall of 1982, Knop agreed with WIC to arrange financing for projects involving the application of LPS technology in the coal industry, including anthracite. Appendix (App.) at 123-25. ATS granted CoalTec an exclusive license to use LPS technology in the coal industry, and WIC agreed to act as exclusive consultant for CoalTec.
 
 
 5
 Meanwhile, in late 1982 Knop and Bruce entered into negotiations with Hamilton Bank to purchase the Donaldson property free of the lien the bank had on it as collateral security for the A & T debt and at the same time to settle their own potential liability on their guarantee of that debt. They reached an agreement on March 18, 1983 (Hamilton Bank contract). Id. at 748.
 
 
 6
 The contract included a detailed description of the Donaldson real property as well as the personal property on it and provided that both would be sold to Knop and Bruce for $300,000, with $80,000 down. Id. at 749. Knop and Bruce were also responsible for all foreclosure and execution expenses, accrued real estate taxes, security expenses and preservation expenses. Id. at 757. The contract provided that Hamilton Bank would institute foreclosure proceedings, leading to a sheriff's sale. Id. at 753-54. The proceeds of any sale of the assets to third parties were to be credited against the $300,000 purchase price. Id. at 756-57. At closing any remaining balance on the $300,000 would be paid by Bruce and Knop, and title would then be transferred from Hamilton Bank to them. They would also be released from all remaining liability for their personal guarantees of the $1,500,000 million mortgage. Id. at 750-51.
 
 
 7
 Meanwhile, by March of 1983 WIC had established a pilot plant for its LPS technology in Camden, New Jersey. The plant extracted ash and moisture from coal silt. About this time Knop met McMahan, an officer of the New York investment banking firm of McMahan, Brafman and Morgan & Co. (MBM). MBM acquired a 12% interest in CoalTec by purchasing $1,000,000 in treasury stock, reducing Potomac's and ATS's interest in it to 44% each. McMahan was then appointed to CoalTec's Board of Directors.
 
 
 8
 Knop paid Hamilton Bank the $80,000 downpayment and it foreclosed, as agreed. On May 20, 1983, the bank purchased the property for $80,000 at a sheriff's sale.[3] Id. at 403. The sheriff issued the deed in Knop's name. Id. at 797a.[4] It was held by the bank pending the closing of the contract, set for July, 1983. After the purchase from the sheriff, some of the equipment on the Donaldson property was sold to various third parties.
 
 
 9
 On May 23, 1983, at a CoalTec board meeting, Knop offered, both orally and in writing, to sell the Donaldson property to either CoalAir[5] or CoalTec at his cost, which he said was $350,000. Id. at 300, 725-26, 768. No agreement was reached.
 
 
 10
 In June, 1983, McMahan and one of his employees, Pat Sheehan, toured the Donaldson property with Knop and Charlie Wynosky, an A & T employee. Id. at 300-01. At trial, McMahan and Wynosky testified that Knop represented that his offer was to sell everything on the property, including a number of coal silt ponds, several buildings, a coal washing plant, an anthracite coal breaking plant, overhead conveyors, shovels, drag lines, at least one truck, a screening plant, several hundred tons of processed coal, two loaders and a 30-car rail siding. Id. at 302, 305, 408-09. In fact, Hamilton Bank had, through Knop, already sold one of the loaders and the screening plant to CoalTec for $16,000. Id. at 113-14. Knop had also sold the processed coal to Harold Felty for $7,113.60. These items were removed from the property after the tour. Id. at 217-18. Knop also stated that the property was free and clear of all encumbrances, except for a mortgage. Id. at 303. Knop did not mention AOV, the bankruptcy or the foreclosure sale. Id. at 302-03.
 
 
 11
 McMahan had doubts about the Donaldson property's suitability for a pilot LPS facility because it had on it only a small supply of coal silt, the raw material for the LPS process. Id. at 303-04. McMahan had toured four or five other sites in the area, each with a significantly greater supply. Id. at 303-04. McMahan's doubts were reinforced when he also learned that the access road to the Donaldson property was impassable during a large part of the year. Id. at 304.
 
 
 12
 On June 27, 1983, Knop wrote a memorandum to Lovejoy and McMahan concerning the sale of the Donaldson property to "CoalTec (CoalAir Systems, Inc.)." In it, he reiterated his offer to sell for $350,000 and included a detailed description of some of the equipment on the property. Id. at 638-42.
 
 
 13
 On June 28, 1983, McMahan, Lovejoy and Green met in Seattle, Washington. Lovejoy had become unenthusiastic about applying the LPS technology in the coal industry and was now so dissatisfied with Knop's fundraising activities that they were no longer on speaking terms. Lovejoy asked McMahan to give $300,000 to WIC to fulfill Knop's fundraising obligations. McMahan testified that he was concerned about the situation because "Bill Lovejoy was the sole repository of this technology walking around in his head." Id. at 306. Early the next morning McMahan, seeking to satisfy Lovejoy, called Knop with an offer to purchase the Donaldson property for $350,000, Knop's alleged cost. In return, Knop was to give WIC $300,000 to satisfy Lovejoy's demand. Knop agreed to make an "officer's loan" of $300,000 to CoalTec. CoalTec would then advance the $300,000 to WIC. McMahan testified that Knop suggested the officer's loan when he told Knop that he would have to assume the credit risk of giving WIC the $300,000. Id. at 311-12. McMahan and the other Donaldson purchasers agreed to convey the property to CoalAir, when it was formed, for a stated consideration equal to the $350,000 paid Knop. Id. at 310-11, 313, 324.
 
 
 14
 McMahan memorialized the conversation with Knop in a written memo, which he gave to Green and Lovejoy that morning and mailed to Knop for confirmation. The memorandum provided, in part, that the Donaldson property was to be purchased by McMahan and several partners and transferred to CoalAir when it was created. Id. at 607-09.[6]
 
 
 15
 On July 1, 1983, Knop conveyed an executed assignment of his interest in the Donaldson property to McMahan, Milton Brafman, James Russell and Victor M. Wexler, the individual investors who had agreed to purchase the Donaldson property. The assignment included the same description of the property as the description attached to the Hamilton Bank contract. Id. at 632-37. Knop's letter accompanying the assignment stated:
 
 
 16
 As you know, I have a final installment of approximately $150,000.00 due on or before July 18, 1983. I have instructed my attorneys to expedite the closing of that agreement so that I can convey, as soon as possible, full legal title to you and your partners free and clear of any encumbrances.
 
 
 17
 Id. at 806. After reading the assignment, McMahan wired Knop $300,000. One week later, a fourth partner wired Knop $50,000. Knop told his bank to wire $300,000 to WIC. Knop had CoalTec record this as an officer's loan from Knop to CoalTec and also as a $300,000 advance from CoalTec to WIC to begin construction of an LPS facility for CoalTec. Id. at 281-82.
 
 
 18
 On August 2, 1983, Knop closed with the Hamilton Bank on the Donaldson property. A document introduced by Knop purporting to be the summary sheet for the closing shows that the total amount due the bank had escalated to $393,333.78, and that despite credits from sales to third parties, Knop still owed the bank money. Id. at 771. Knop testified that he paid the bank $179,385 and his attorneys paid the remaining balance of $62.31.[7] Knop received the sheriff's deed from the bank and recorded it on August 11, 1983. That deed contained a clause reserving title to all coal in the ground to a former owner of the property. Id. at 821.
 
 
 19
 On August 18, 1983, at a CoalTec board meeting, Knop delivered a special warranty deed conveying his interest in the Donaldson property to McMahan, Brafman, Russell and Wexler. Id. at 33. At the same meeting, CoalTec resolved to repay $100,000 on Knop's officer's loan. Id. at 324. However, the Board found out that Knop had already sold the screening plant and a loader from the Donaldson property to CoalTec for $16,000, and the balance due Knop was accordingly reduced to $184,000 on CoalTec's books.
 
 
 20
 CoalAir was formed as a limited partnership on December 9, 1983 with MBM as its general partner. McMahan and the other individual investors transferred the Donaldson property to CoalAir in exchange for limited partnership interests at a stated consideration of $350,000. A title search then revealed that Knop had only transferred title to the surface of the Donaldson property and that title to the coal in place was reserved by a prior owner. Under Pennsylvania law, this places the risk of subsidence caused by mining operations to extract the coal on the surface owner, subjecting any surface structure to damage or destruction caused by past, present or future deep mine operations. Id. at 348, 389-90.[8]
 
 
 21
 WIC never performed on its contract to construct a pilot plant on the property for Lovejoy's LPS technology. On February 10, 1984, CoalAir notified WIC that it was in default. Id. at 343. MBM voluntarily repurchased all of the outstanding limited partnership interests of CoalAir. Id. at 345.[9]
 
 
 22
 On December 12, 1983, Knop filed a complaint, as well as a lis pendens against Donaldson, in the Court of Common Pleas of Schuylkill County. In a second amended complaint Knop alleged that McMahan, Brafman, Russell, Wexler and CoalAir breached a promise to repay the $300,000 loan made by Knop to CoalTec and sought $200,000 in damages, the amount said to be outstanding on Knop's officer's loan. Defendants removed the case to the district court pursuant to 28 U.S.C.A. Sec. 1441 (West 1973) and counterclaimed for fraud, breach of contract, conversion and unjust enrichment.
 
 
 23
 After a three-day bench trial, the district court dismissed Knop's claims and entered judgment for CoalAir on its counterclaim in the amount of $293,113.60, plus interest and costs. It denied Knop's Federal Rule of Civil Procedure 59 motion to vacate or, in the alternative, for a new trial, as well as CoalAir's motion to amend the judgment by adding prejudgment interest.
 
 III. SUBJECT MATTER JURISDICTION
 
 24
 Federal subject matter jurisdiction in this case is based on diversity of citizenship under 28 U.S.C.A. Sec. 1332(a) (West Supp.1988). In their petition for removal to the district court, defendants averred complete diversity of citizenship between the parties, stating that "none of the limited partners of either CoalAir or MBM is a citizen of the Commonwealth of Pennsylvania or the Commonwealth of Virginia." Defendants' Petition for Removal at 3. The petition failed to affirmatively state MBM's citizenship. Neither Knop nor the district court requested a listing of CoalAir's general and limited partners and their citizenship.[10]
 
 
 25
 Sua sponte, we asked CoalAir to provide the names and citizenship of its general and limited partners, and of those partners that were partnerships themselves, such as MBM.[11] See Trent Realty Assocs. v. First Fed. Sav. and Loan Assoc. of Philadelphia, 657 F.2d 29, 31 (3d Cir.1981) (court sua sponte raises question of district court's jurisdiction); Medlin v. Boeing Vertol Co., 620 F.2d 957, 960 (3d Cir.1980) ("It is the responsibility of this court to inquire, sua sponte, into the question of the subject matter jurisdiction of the district court."). Only at this point was it discovered that MBM, a general partner in CoalAir, had three limited partners who were citizens of the Commonwealths of Pennsylvania or Virginia. These three persons were limited partners until December, 1984 when their partnership interests were terminated as part of an overall restructuring of the MBM partnership. Therefore, they were limited partners of MBM on December 12, 1983, when suit was filed in the state court and the case removed to federal district court, but not during the trial or at the time final judgment was rendered in the case.[12]
 
 
 26
 Normally, "jurisdiction is to be tested by the status of the parties at the commencement of the suit." Field v. Volkswagenwerk AG, 626 F.2d 293, 305 (3d Cir.1980). However, because the defendants did not fully set out MBM's citizenship in their petition for removal and because both Knop and the district court did not make them do so, the dispute was fully litigated and a judgment entered before the initial absence of complete diversity was noted. Knop now argues that the district court lacked subject matter jurisdiction and that we must therefore vacate that judgment, order the district court to remand to the state court and award him attorney fees under Federal Rule of Civil Procedure 11, as well as costs under 28 U.S.C.A. Sec. 1447(c) (West 1973).
 
 
 27
 Because the district court had diversity jurisdiction over the parties at the time of trial and when judgment was entered, we do not believe it is necessary to vacate the district court's judgment. See American Fire & Casualty Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951). In Finn, the United States Supreme Court concluded that a defendant had improperly removed a state action to federal court under 28 U.S.C.A. Sec. 1441(c) because the plaintiff's complaint did not allege a "separate and independent" removable claim. It therefore reversed the Court of Appeals and remanded with instructions for the district court to vacate the judgment and, if no steps were taken by the parties to cure the jurisdictional deficiency, to remand the matter to the appropriate state court. The Court stated:
 
 
 28
 There are cases which uphold judgments in the district courts even though there was no right to removal. In those cases the federal trial court would have had original jurisdiction of the controversy had it been brought in federal court in the posture it had at the time of the actual trial of the cause or of the entry of the judgment. That is, if the litigation had been initiated in the federal court on the issues and between the parties that comprised the case at the time of trial or judgment, the federal court would have had cognizance of the case.
 
 
 29
 Id. at 16, 71 S.Ct. at 541 (footnote omitted) (emphasis added);[13] see also Grubbs v. General Elec. Credit Corp., 405 U.S. 699, 705, 92 S.Ct. 1344, 1349, 31 L.Ed.2d 612 (1972) (jurisdiction must exist at time of judgment); Medlin, 620 F.2d at 963 (same). In Grubbs, the Supreme Court stated:
 
 
 30
 Longstanding decisions of this Court make clear, however, that where after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court.
 
 
 31
 Grubbs, 405 U.S. at 702, 92 S.Ct. at 1347. Because the district court would have had diversity jurisdiction over the parties had the action been brought there originally, the Court held that an improper removal based on an inseparable claim could not be raised for the first time on appeal. Id. at 705-06, 92 S.Ct. at 1348-49. Grubbs has since been interpreted to extend to cases in which the district court lacked diversity jurisdiction at the time of removal, "if the defect subsequently is cured before it is noticed," but prior to trial and judgment. 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3723 at 319 (West 2d ed.1985). See, e.g., Riggs v. Island Creek Coal Co., 542 F.2d 339, 342 (6th Cir.1976) ("defendant was estopped from asserting absence of diversity of citizenship where no objection to the court's jurisdiction was raised until after the date of judgment and where it is clear that at the time of judgment diversity of citizenship did in fact exist"); McKay v. Boyd Constr. Co., 769 F.2d 1084, 1087 (5th Cir.1985) (plaintiff waived diversity jurisdiction defect by failing to raise during district court proceedings). We believe those cases are grounded in sound principles of judicial efficiency and economy and that those principles apply here.[14]
 
 
 32
 This factually complex dispute has been completely adjudicated by a court which had jurisdiction over the parties throughout the trial and at the time of judgment. The parties and the court have devoted extensive resources to its adjudication. They have had the benefit of a full assessment of the disputed evidence by an impartial factfinder. To erase the result of that process by requiring them to litigate their claims all over again in a state court does not seem to us necessary under the case law with respect to removal for diversity. In reaching this conclusion, we are mindful of the limited nature of the district court's jurisdiction and the Supreme Court's cautions against improper expansion of federal jurisdiction:
 
 
 33
 The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation or by prior action or consent of the parties. To permit a federal trial court to enter a judgment in a case removed without right from a state court where the federal court could not have original jurisdiction of the suit even in the posture it had at the time of judgment, would by the act of the parties work a wrongful extension of federal jurisdiction and give district courts power the Congress has denied them.
 
 
 34
 Finn, 341 U.S. at 17-18, 71 S.Ct. at 542 (footnote omitted).[15]
 
 
 35
 Had there been a lack of diversity between the parties throughout the proceedings in the trial court, we would have to vacate the district court's order and direct it to remand the matter to the state court. See Trent Realty, 657 F.2d at 32. However, in this case, the complete diversity between the parties at the time of the trial and judgment makes a remand unnecessary.[16]
 
 
 36
 We also requested the parties, sua sponte, to submit briefs on whether their post-trial motions under Federal Rule of Civil Procedure 59 were timely. Rule 59 requires that motions for a new trial and to alter or amend the judgment be served "not later than 10 days after" the entry of judgment. Fed.R.Civ.P. 59(b), (e).
 
 
 37
 We are satisfied that the parties' post-trial motions are timely. Judgment was entered on May 4, 1988. Computing time under Federal Rule of Civil Procedure 6, the last day the parties could timely serve their motions was May 18, 1988. CoalAir's motion to amend the judgment to add prejudgment interest was filed and served on May 18, 1988. Knop's motion to vacate the judgment or, in the alternative, for a new trial, was filed in the district court on May 23, 1988. However, Knop's submissions to this court show that Knop served defendants' counsel with notice of the motion on May 18, 1988. Since service is complete upon mailing, Knop's post-trial motion was timely served. Fed.R.Civ.P. 5(b). The motion itself was filed in the district court within a reasonable time thereafter. Fed.R.Civ.P. 5(d). Therefore, we have appellate jurisdiction pursuant to 28 U.S.C.A. Sec. 1291 and turn to the merits of this appeal.
 
 IV. FRAUD
 
 38
 Knop argues that the district court's conclusion that he defrauded CoalAir in the sale of the Donaldson property was clearly erroneous.[17] Pennsylvania law, which applies in this diversity action, requires that the following elements be established to show fraud: (1) a misrepresentation (2) made by a person (3) with the intent to induce the recipient to act on it (4) which the recipient justifiably relies on and (5) which proximately damages the recipient. Delahanty v. First Pennsylvania Bank, N.A., 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983). Pennsylvania also requires fraud to be established by "evidence that is clear, direct, precise and convincing." Carlson v. Sherwood, 416 Pa. 286, 287, 206 A.2d 19, 20 (1965); Delahanty, 318 Pa.Super. at 109-10, 464 A.2d at 1252-53; see also Roman Ceramics Corp. v. Peoples Nat'l Bank, 714 F.2d 1207, 1214 (3d Cir.1983).
 
 
 39
 Based on the evidence introduced at trial, the district court concluded:
 
 
 40
 Knop defrauded defendants in connection with the transaction in that: (a) he represented (i) that he would convey certain equipment and coal with the land, (ii) that he was conveying the land at his cost, and (iii) that he was conveying the land free and clear of all liens and encumbrances; (b) he knew those representations to be false when made; (c) the representations were made to induce defendants to rely thereon; (d) which they did; (e) resulting in damage, particularly to CoalAir, the current equitable owner of the site.
 
 
 41
 App. at 487. Because Knop does not argue on appeal that the district court applied the wrong legal standard but only that the evidence was insufficient to meet it, we review the district court's factual findings for clear error:
 
 
 42
 This standard of review does not permit an appellate court to substitute its findings for those of the trial court. It allows only an assessment of whether there is enough evidence on the record to support those findings. That a different set of inferences could be drawn from the record is not determinative. It is sufficient that the District Court findings of fact could be reasonably inferred from the entire trial record.
 
 
 43
 In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 676 F.2d 51, 54 (3d Cir.1982).
 
 
 44
 Knop first argues that CoalAir failed to meet its burden of proof that he knowingly misrepresented material facts concerning the Donaldson property. He argues that none of his statements regarding his cost in or title to the property or the assets that would be conveyed with the land were misrepresentations. Because the district court only had to find that Knop knowingly made one material misrepresentation to establish this element of fraud, Knop's argument that appellees failed to establish the element of misrepresentation is unavailing so long as at least one of the district court's findings on misrepresentation is not clearly erroneous. Turning first, therefore, to what we think is Knop's strongest argument, we consider his claim that appellees failed to show he misrepresented his cost for the Donaldson property.
 
 
 45
 Knop says the record shows that his actual cost for the Donaldson property was "approximately $350,000," not just the $80,000 shown as paid on the return of sheriff's sale. In support, he relies on his purchase contract with the Hamilton Bank. Id. at 748-67. He points to the fact that it states that the consideration for the Donaldson property is $300,000 plus other administrative costs. As a circumstance supporting payment of the $300,000 stated consideration, he refers to the fact that the bank did not deliver the deed to Knop until the closing on August 2, 1983, although the sheriff's sale occurred on May 20, 1983. He also refers us to a settlement sheet which he says shows an August 2, 1983 payment of $179,385 to the bank, in addition to the $80,000 shown on the sheriff's return.
 
 
 46
 Knop did not produce evidence verifying the settlement sheet's authenticity and there was evidence that another offer had been made for the Donaldson property by a third party for approximately $75,000. Id. at 425. In addition, the contract itself, as well as the Hamilton Bank's release of Knop from liability on his guarantee, show that he paid $300,000 to the bank in settlement of his obligation on A & T's outstanding liabilities but not for the property. It is the trial judge, as factfinder in a bench trial, who resolves the conflict. The district court's finding that Knop materially misrepresented his actual cost of acquiring the Donaldson property was not clearly erroneous.[18]
 
 
 47
 On the elements of intent and reliance, Knop argues that CoalAir failed to prove by "clear, direct, precise and convincing" evidence that he made the false representations with the intent of inducing CoalAir's reliance, and that CoalAir in fact relied on them. He says that when he made the representations, "it simply was not contemplated ... that McMahan or CoalAir would purchase the Donaldson property." Brief for Appellant at 39. Instead, he asserts that he made his representations only in connection with an offer to sell the property to CoalTec.
 
 
 48
 In Gillespie v. Hunt, 276 Pa. 119, 126-27, 119 A. 815, 817, cert. denied, 261 U.S. 622, 43 S.Ct. 519, 67 L.Ed. 832 (1923), the Pennsylvania Supreme Court said:
 
 
 49
 The false statement must have been made for the purpose of being acted upon either by the person to whom it was made, or by some third person who it can be reasonably said was within the contemplation of defendant and to whom the statement was intended to be communicated.
 
 
 50
 The record contains clear evidence that Knop contemplated Donaldson's use as a future showcase for the LPS technology. Because CoalAir was still in the planning stages, Knop made his representations to McMahan and the other members of the CoalTec board. However, Knop's own memorandum to McMahan and Lovejoy, dated June 27, begins by stating: "I thought it useful to give you a detailed description of the real property and personal property at Donaldson, Pennsylvania which my brother-in-law, Mark Bruce, and myself have agreed to sell to CoalTec (CoalAir Systems, Inc.) for $350,000." App. at 638.[19]
 
 
 51
 As for CoalAir's actual reliance, Knop claims that McMahan's testimony that he purchased Donaldson to liquify Knop and not for any commercial purpose shows that CoalAir never actually relied on Knop's representations in purchasing Donaldson. See id. at 358, 371. The district court, however, properly inferred from the evidence that McMahan at the very least relied on Knop's representation that his title was free and clear of all encumbrances in deciding to purchase the property. Id. at 318. CoalAir's organizers relied on free and clear title in their plan to use Donaldson as a showcase for the LPS technology. The district court could also have inferred that McMahan would not have agreed to pay Knop $350,000 if he knew the true facts about the Donaldson property and Knop's arrangement with Hamilton Bank, but would instead have found some other means to liquify Knop, whether by loaning him the money or otherwise. In short, it was reasonable for the district court to infer that McMahan and his partners would not have finally parted with $350,000 if they had not relied on Knop's misrepresentation as to his cost. The district court did not clearly err in finding that CoalAir relied on Knop's representations.
 
 
 52
 Thus, we hold that the evidence in this case is sufficiently "clear, direct, precise and convincing" to permit the district court to find that Knop defrauded the individual appellees when he sold the Donaldson property to them for $350,000.
 
 V. BREACH OF CONTRACT
 
 53
 CoalAir's cross-complaint also included a claim against Knop for breach of contract because Knop failed to sell the property at his cost, failed to convey title free and clear of all encumbrances, and failed to convey the coal, screening plant and loader as promised. In its opinion, the district court concluded that Knop breached his promises regarding the sale, "thereby damaging defendants, particularly CoalAir." Id. at 487.
 
 
 54
 Initially, Knop argues that the district court's finding that CoalAir was either a party or a third party beneficiary of the contract between Knop and McMahan is clearly erroneous. This argument is a variant on the theme of CoalAir's non-existence when the deal was made. It has no more merit on the contract issue than it did on fraud. In Rees v. Mosaic Technologies, Inc., 742 F.2d 765, 768-69 (3d Cir.1984), we noted:
 
 
 55
 [W]hile it is true that in general a corporation does not exist as a legal entity until incorporated, and therefore cannot have agents before its organization, see 18 Am.Jur.2d Corporations Sec. 119 (1965), the pre-incorporation activities of a promoter may form the basis for corporate liability when they have been ratified by post-incorporation acts of the corporation.
 
 
 56
 This rationale has been applied to allow a corporation to enforce rights under a contract entered into by a pre-incorporation promoter. Blackwood Coal Co. v. Deister Concentrator Co., 626 F.Supp. 727, 730 (E.D.Pa.1985). We believe it applies equally to limited partnerships.
 
 
 57
 The district court had before it evidence that McMahan and the other individual defendants purchased Donaldson with the understanding that it would be sold to CoalAir upon CoalAir's formation. McMahan testified that Knop's offer to sell Donaldson at the May 23, 1983 CoalTec board meeting was made "in the context of creating a showplace for the LPS technology" and that Donaldson would be "a staging area in the anthracite coal fields for the purpose of this showcase project development." App. at 300. A June 27, 1983 memorandum from Knop to Lovejoy and McMahan expressly concerned the sale of Donaldson to "CoalTec (CoalAir Systems, Inc.)." Id. at 638. Although McMahan testified that his primary purpose in purchasing Donaldson was to liquify Knop so that Knop could advance $300,000 to Lovejoy and WIC to fulfill his financial obligation, id. at 358, McMahan also testified that CoalTec was going to build an LPS facility on the Donaldson property and then sell the facility to CoalAir upon its formation. Id. at 313, 324. McMahan included this understanding in a memorandum written to Green and Lovejoy on June 29, 1983, which stated that "[McMahan] and partners will buy Donaldson facility and trade it dollar for dollar into [CoalAir] when [CoalAir] is complete." Id. at 608. CoalAir ratified the Knop-McMahan contract upon its formation on December 9, 1983, at which time McMahan, Brafman, Russell and Wexler transferred Donaldson to CoalAir in exchange for limited partnership interests they stated had a cost equivalent of $350,000, equivalent to what they had paid Knop for the Donaldson property. From this evidence the district court could properly conclude that CoalAir ratified the contract of its promoters. The district court did not err in concluding that CoalAir was entitled to enforce its promoters' rights under their contract with Knop.
 
 
 58
 Alternately, Knop says he never breached the contract. The relevant evidence on this point is largely the same as on the fraud issue. It was at best conflicting and the district court resolved the conflict against Knop. The record shows Knop offered to sell Donaldson "at his cost" of $350,000. The district court found that to the contrary Knop had purchased the property for $80,000 at a sheriff's foreclosure sale, incidental to his contract with Hamilton Bank to acquire the property and settle his obligation on the guarantee he gave Hamilton Bank on a $1,500,000 mortgage given by A & T, a corporation then in Chapter 11 bankruptcy proceedings. Again, the district court did not clearly err in so finding.[20]
 
 VI. DAMAGES
 
 59
 Finally, Knop argues that the district court's damage award of $293,113.60 was excessive.[21] The district court awarded CoalAir $270,000 representing the difference between Knop's cost and the sale price, less $16,000 for the equipment and $7,113.60 for processed coal he had already sold when he represented it would go to the buyers with the Donaldson land.[22] He says the district court could not have found that Donaldson cost him less than $277,062.31. He relies on the alleged settlement sheet with Hamilton Bank, id. at 771, his own testimony and the testimony of Charlie Wynosky. We hold that the district court did not clearly err in this determination. We will therefore affirm this aspect of its damage award.
 
 
 60
 Knop also argues that on August 18, 1983, CoalTec conveyed the end loader and screen plant to CoalAir at no cost, and that therefore the damage award should be decreased by $16,000. Appellees state that even though this resolution was passed, CoalAir has yet to receive the equipment. They also argue that it is only CoalTec which benefited from this transaction by virtue of the corresponding reduction in Knop's outstanding officer's loan to CoalTec. Again, we hold that the district court did not clearly err in awarding damages. We will therefore affirm the damage award.
 
 VII. PREJUDGMENT INTEREST
 
 61
 On cross-appeal, CoalAir contends that the district court abused its discretion when it refused to award prejudgment interest. It says that it is entitled to prejudgment interest on its contract claim as a matter of law, citing our recent decision in Buford v. Wilmington Trust Co., 841 F.2d 51, 56-57 (3d Cir.1988) (under Pennsylvania law prejudgment interest is a matter of legal right in breach of contract cases). In response, Knop argues that prejudgment interest is only available for "liquidated" obligations, and that the fraud claim was not liquidated. Even if Knop were correct in asserting the proposition that interest is not available on fraud claims, he has also breached his contract. The facts necessary to the determination of CoalAir's damages from that breach were all ascertainable after the sheriff's sale and the closing of his contract with Hamilton Bank. Knop's argument confuses a party's knowledge of the facts needed to determine damages with their existence.
 
 
 62
 In Trustees of the Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890 (3d Cir.1987), we recognized that "Pennsylvania courts have generally followed the Restatements on the award of pre-judgment interest." Id. at 908 (citing Penneys v. Pennsylvania R.R., 408 Pa. 276, 183 A.2d 544 (1962)). Restatement of Contracts (Second) Sec. 354, formerly Restatements of Contracts Sec. 337, states, in relevant part:
 
 
 63
 If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due....
 
 
 64
 See also Black Gold Coal Corp. v. Shawville Coal Co., 730 F.2d 941, 943 (3d Cir.1984) (applying Restatement of Contracts Sec. 337(a) to breach of contract action in Pennsylvania diversity case). "A debt is considered liquidated when it is capable of ascertainment with mathematical precision, or ... 'by market value or other definite standards,' and a dispute between two amounts so ascertained does not alter its liquidated character." American Enka Co. v. Wicaco Mach. Corp., 686 F.2d 1050, 1057 (3d Cir.1982) (quoting Richards v. Citizens Natural Gas Co., 130 Pa. 37, 40, 18 A. 600, 600 (1889)). In this case, CoalAir's damages for Knop's breach had an easily ascertainable monetary value: $270,000 for the difference between Knop's asserted cost of $350,000 and his real cost of $80,000, $16,000 for the already sold equipment and $7,113.60 for the already sold pile of processed coal. Under applicable Pennsylvania law, we are constrained to hold that the district court abused its discretion in denying CoalAir prejudgment interest on its damage award.
 
 VIII.
 
 65
 Accordingly, we will affirm the district court's findings of fact and conclusions of law, but reverse its order denying prejudgment interest and remand for the determination of such interest.
 
 
 
 *
 Hon. John F. Gerry, Chief Judge of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 The district court also entered final judgment against Knop on his claim for damages arising out of the Donaldson transaction. Knop does not appeal that order
 
 
 [2]
 Security for the original loan included the Donaldson property, a first security interest in certain A & T assets and all of the capital stock of Birren Coal Co., a subsidiary of A & T
 
 
 [3]
 The appellees claim that some of the equipment on Donaldson was sold at a prior sheriff's sale on May 18, 1983 for $120,000, thereby reducing Knop's and Bruce's obligations on the Hamilton Bank contract by a corresponding amount. The contract's settlement sheet shows a credit from the sheriff of $87,592.25 titled "A & T Personalty Sale" and for "Birnen Personalty Sale" a credit of $21,429.22. App. at 771
 
 
 [4]
 The affidavit of value for the real estate transfer tax, attached to the deed, lists the fair market value of the property at $36,180. The highest assessed value listed is $27,195. See App. at 798
 
 
 [5]
 CoalAir was to be a "showcase" for the use of LPS technology in the coal industry. The form of organization eventually used was a limited partnership. It ultimately became the owner of the Donaldson property for use in developing and promoting the LPS technology, a use which never took place
 
 
 [6]
 At this point, McMahan refers to CoalAir as a limited partnership, the form it eventually took. Earlier discussions had indicated a corporation
 
 
 [7]
 The record also contains a release executed August 9, 1983 by the vice president of Hamilton Bank. It provides that in exchange for $300,000, Hamilton Bank released Knop and Bruce of all rights and liabilities from their personal guarantees on the A & T obligation. App. at 1121
 
 
 [8]
 Such reservations are common in Pennsylvania's anthracite coal counties and are the subject of a Pennsylvania statute requiring the inclusion of a warning notice about them on all deeds in coal bearing areas of those counties. See 52 Pa.Stat.Ann. tit. 52, Sec. 1551 (Purdon 1966). The problem arises out of Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)
 
 
 [9]
 On December 19, 1983, Knop and Evans were removed as officers of CoalTec for cause. Id. at 337
 
 
 [10]
 28 U.S.C.A. Sec. 1446(a) (West 1973) requires that the defendant include in his petition "a short and plain statement of the facts which entitle him ... to removal."
 
 
 [11]
 The citizenship of a partnership is determined by looking to the citizenship of its general and limited partners. Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 456, 20 S.Ct. 690, 693, 44 L.Ed. 842 (1900); Carlsberg Resources Corp. v. Cambria Savings and Loan Assoc., 554 F.2d 1254, 1261 (3d Cir.1977); see Trent Realty Assocs. v. First Fed. Sav. and Loan Assoc. of Philadelphia, 657 F.2d 29, 32 (3d Cir.1981)
 
 
 [12]
 Trial began on March 28, 1988
 
 
 [13]
 The cases relied on by the Supreme Court include Baggs v. Martin, 179 U.S. 206, 21 S.Ct. 109, 45 L.Ed. 155 (1900) (no federal question); Bailey v. Texas Co., 47 F.2d 153 (2d Cir.1931) (no separate and independent claim); Handley-Mack Co. v. Godchaux Sugar Co., 2 F.2d 435 (6th Cir.1924) (improper removal but diversity of citizenship existed between parties); and Toledo, St. L. & W. R.R. v. Perenchio, 205 F. 472 (7th Cir.1913) (no separate and independent claim)
 
 
 [14]
 As a fallback position, CoalAir argues that it is only a nominal party in this action and that under Salem Trust Co. v. Manufacturers' Fin. Co., 264 U.S. 182, 189, 44 S.Ct. 266, 267, 68 L.Ed. 628 (1924), its citizenship need not be considered in determining whether diversity exists. Because of our conclusion that diversity jurisdiction existed in the district court, we find it unnecessary to consider this argument
 
 
 [15]
 This note of caution is particularly appropriate today given the pressure on the system created by the burgeoning dockets of the federal courts and the recent passage of legislation to partially relieve that pressure by, inter alia, increasing the jurisdictional amounts for diversity cases to $50,000. See Judicial Improvements and Access to Justice Act, Pub.L. No. 100-702, Secs. 201-203, 102 Stat. 4642, 4646 (1988) (amending 28 U.S.C. Sec. 1332 (1982))
 
 
 [16]
 While the issue of subject matter jurisdiction cannot be waived, we do note that a party who opposes removal is well advised to investigate the existence of complete diversity at the outset lest changes in the parties occurring before trial or judgment cure the defect. See, e.g., Di Frischia v. New York Cent. R.R., 279 F.2d 141 (3d Cir.1960) (defendant who at first challenged diversity and then stipulated to its existence in answer estopped from reasserting challenge at time of trial). We note that there is no evidence that the three MBM limited partners who were citizens of Pennsylvania or Virginia left MBM in order to "manufacture" diversity jurisdiction. To permit a case in which there is complete diversity throughout trial to proceed to judgment and then cancel the effect of that judgment and relegate the parties to a new trial in a state court because of a brief lack of complete diversity at the beginning of the case would be a waste of judicial resources. It would also encourage litigants to speculate on the jurisdiction issue by saving it for use in the event of a loss
 We note that the district court could have relieved itself of the burden of this case by requiring the parties to fully set forth the jurisdictional facts at the outset and then itself raise the jurisdictional problem.
 
 
 [17]
 After judgment was entered, Knop filed a post-trial motion to vacate the judgment or, alternately, for a new trial, arguing that CoalAir had no legal right to pursue an action for fraud against him because it did not legally exist at the time of the transaction, could not have been aware of any misrepresentation, and did not deal directly with Knop. The district court summarily rejected this argument in its order denying Knop's motion on June 16, 1988. Knop now attempts to raise it on appeal. To the extent this issue is not waived by Knop's failure to timely raise it, it lacks merit. See also infra Section V
 
 
 [18]
 Knop also argues that he did not knowingly misrepresent his title to the property. Knop claims that there is no evidence that he knew that he was getting title to just the surface, without the mineral rights to the coal in place, because that reservation was not included in the description of the property attached to the Hamilton Bank contract, and he did not review the sheriff's deed after he received it on August 2, 1983. This argument assumes that he had no knowledge of the encumbrance as president of AOV Industries or of the common practice in Pennsylvania's anthracite counties of severing surface from mineral titles. See supra note 8. In his letter accompanying the July 1 assignment, Knop told the defendants that he was transferring title free and clear of all encumbrances. App. at 806. The restriction was on the face of the sheriff's deed. The district court's finding discrediting Knop's claim of ignorance was not clearly erroneous
 Finally on this point, Knop argues that even if there was evidence of knowledge, the misrepresentation was not material because McMahan decided to buy the property before he received the July 1 assignment with the accompanying misrepresentation. The record shows Knop knew of the defendants' possible use of the property for the LPS technology, and that the title problem would be material to their decision to purchase because they would be at risk of subsidence from mining operations if they constructed an LPS facility on the land.
 Knop also contends that his "generic" statement regarding inclusion of all of the equipment and coal on the property to McMahan did not support the district court's finding that he had misrepresented to McMahan that one of the loaders, the screening plant, and the processed coal would be included in the sale when they were, in fact, already sold. This argument also lacks merit. The district court's finding that Knop knowingly misrepresented material facts about the Donaldson property was not clearly erroneous.
 
 
 [19]
 See supra note 5 with respect to the nature of CoalAir
 
 
 [20]
 Knop also argues that his special warranty deed was accepted by the defendants, thereby extinguishing any contractual claim that Knop delivered less than he promised under the doctrine of "merger by deed." Knop raises this argument for the first time on appeal. It is waived
 
 
 [21]
 Knop also argues that the district court erred in dismissing his unjust enrichment claim against CoalAir. We have considered this argument and reject it
 
 
 [22]
 Knop does not challenge the portion of the award for the pile of processed coal