Opinion for the Court filed by Circuit Judge ROGERS.
 

 ROGERS, Circuit Judge:
 

 Appellant Fawaz Farouki appeals from a judgment awarding appellee Rafie Saadeh $758,470 for breach of contract for failure to repay a commercial loan. Prior to oral argument, the court ordered the parties to be prepared to address whether the district court lacked subject matter jurisdiction over the lawsuit under 28 U.S.C. § 1332(a). Subsequently, the court invited the parties to file supplemental briefs on the jurisdictional issue, which they did. We now hold that the district court lacked subject matter jurisdiction, and therefore vacate the judgment of the district court and remand the case with instructions to dismiss the complaint.
 

 I.
 

 Throughout the 1980s, Fawaz Farouki, the owner of several construction companies doing business in the Middle East and Europe, invested millions of. dollars in various enterprises through his investment company, Dinavest, Ltd., a United Kingdom corporation with its principal place of business in Monte Carlo, Principality of Monaco. In 1984, hoping to invest in a California company, Four Point Entertainment, Farouki and Dinavest borrowed $550,000 from Rafic Saadeh, a businessman residing in Athens, Greece. Saadeh received a promissory note in exchange for his loan in September 1984. This was the first of three repayment agreements entered into by the parties, all of which resulted in a default by Farouki.
 

 Shortly after the 1984 loan, Farouki and Dinavest began experiencing financial difficulties, and Farouki defaulted on his obligations to numerous creditors. After approximately $800,000 in cheeks he sent to Saadeh were returned for insufficient funds, Farouki made no further payments on his loan from Saadeh. Having defaulted on his loan obligation, Farouki met with Saadeh and they entered into a second agreement in June 1986. Under this agreement Farouki and Dinavest were required to repay Saadeh $1,257,800,- apparently representing the $550,000 principal plus over $700,000 in accrued interest and finance charges. The 1986 agreement set October 13, 1986, as the default date; if Farouki failed to repay Saa-deh in full by then, Saadeh had the right to take as collateral $3.3 million of Four Point stock as well as three notes payable to Dina-vest by Foui- Point that Farouki had used to secure the debt, and to receive annual interest of fifteen percent on any remaining debt.
 

 Farouki again defaulted on his agreement and surrendered the stock and the assigned notes to Saadeh. Because the value of the stock and notes did not fully compensate Saadeh, Saadeh made additional attempts to recover the outstanding amount; Farouki acknowledged his indebtedness and repeatedly promised repayment. In 1987, Saadeh traveled from Greece to New York State to negotiate another repayment agreement with Farouki. Ultimately, théy agreed that Far-ouki and Dinavest would pay Saadeh $758,-470 plus interest at nine percent per annum in six installments over two years. Farouki again defaulted under the terms of the 1987 agreement.
 

 In 1992, Saadeh filed suit in the United States District Court for the District of Columbia against Farouki, his wife, Dinavest, and L.R. Holdings, a District of Columbia corporation owned and operated by Mrs. Farouki. He sought damages for breach of contract and an accounting. At that time, Farouki was a citizen of Jordan, and Mrs. Farouki was apparently a citizen of Egypt. Beginning in 1989, however, the Faroukis had become permanent residents of Mary
 
 *-1522
 
 land.
 
 [1]
 
 The sole basis of jurisdiction alleged in Saadeh’s complaint was diversity of citizenship, 28 U.S.C. § 1332.
 

 FarouM and Dinavest filed an answer to the complaint, and all defendants filed a motion to dismiss the claims for an accounting on the ground that they failed to state a claim for which relief could be granted. The district court denied the motion. Discovery proceeded, and shortly before trial, the defendants filed a motion to dismiss on the ground that the court lacked subject matter jurisdiction because the plaintiff, Saadeh, was an alien, and three of the defendants — Far-ouki, Mrs. Farouki and Dinavest — were also aliens at the time the complaint was filed. Saadeh, in response, claimed that he had evidence that Farouki had become a United States citizen since the complaint had been filed, and that, in any event, as an alien admitted for permanent residence, he would be deemed a United States citizen for the purposes of diversity jurisdiction under a 1988 amendment to § 1332.
 
 See
 
 Judicial Improvements and Access to Justice Act, Pub.L. No.100-702, § 203, 102 Stat. 4646 (1988). Farouki maintained that even if Saa-deh was correct, a jurisdictional defect still existed as to Dinavest, which he described as an indispensable party. After a brief conference, the parties entered into a joint stipulation, agreeing that Farouki had become a United States citizen in 1993 and to the dismissal of Mrs. Farouki, Dinavest, and L.R. Holdings. The district court dismissed these defendants pursuant to the stipulation, and denied the motion to dismiss. Although Farouki subsequently testified that he resided in Alexandria, Egypt, the court made no finding as to whether he had acquired a new domicile. Following a bench trial, the court found that the 1987 agreement was a valid contract and that Farouki was in breach, and entered judgment for Saadeh in the amount of $758,470, plus nine percent annual interest from the date of the agreement.
 

 On appeal, Farouki initially did not pursue the jurisdictional challenge. Rather, he contended that the district court erred in three respects in concluding that the 1987 loan agreement was valid. He maintained that the 1984 loan was usurious and .that the 1987 agreement failed to purge the usury; that the district court was barred under the parol evidence rule from considering extrinsic evidence that contradicted certain recitals contained in the 1987 agreement; and that the 1987 agreement was void for lack of consideration because the 1984 agreement was void. Upon reviewing the briefs on appeal and the record of the district court, this court directed the parties’ attention to a possible jurisdictional defect because both Saadeh and Farouki were aliens at the time Saadeh filed his complaint. We turn to that question now, assisted by the parties’ supplemental briefs.
 

 II.
 

 Under Article III of the Constitution, the judicial power of the United States extends to “Controversies ... between citizens of different States ... and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.” U.S. Const. art. III, § 2. Article III requires only minimal diversity, that is, diversity of citizenship between any two parties on opposite sides of an action, regardless of whether .other parties may be co-citizens.
 
 State Farm Fire & Casualty Co. v. Tashire,
 
 386 U.S. 523, 530-81, 87 S.Ct. 1199, 1203-04, 18 L.Ed.2d 270 (1967). Congress has never granted the district courts the full measure of diversity jurisdiction permitted by the Constitution, however. In
 
 Strawbridge v. Curtiss,
 
 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806), the Supreme Court construed the diversity provision of the Judiciary Act of 1789 to require that no two parties on opposite sides of an action could be citizens of the same State. The current diversity statute, 28 U.S.C. § 1332,
 
 [2]
 
 
 *-1521
 
 retains this requirement of “complete diversity.” Consequently, “[f|ederal diversity jurisdiction is lacking if there are any litigants from the same state on opposing sides.”
 
 Prakash v. American Univ.,
 
 727 F.2d 1174, 1178 n. 25 (D.C.Cir.1984). The Supreme Court has never addressed the scope of the complete diversity rule in eases involving alien parties. Prior to 1988, however, this court held, as have others, that the diversity statute did not confer jurisdiction over a lawsuit involving an alien on one side, and an alien and a citizen on the other side.
 
 Eze v. Yellow Cab Co.,
 
 782 F.2d 1064, 1065 (D.C.Cir. 1986);
 
 see also Cabalceta v. Standard Fruit
 
 Co., 883 F.2d 1553, 1557 (11th Cir.1989);
 
 Fay sound Ltd. v. United Coconut Chemicals, Inc.,
 
 878 F.2d 290, 294-95 (9th Cir.1989);
 
 Corporation Venezolana de Fomento v. Vintero Sales Corp.,
 
 629 F.2d 786, 790 (2d Cir.1980),
 
 cert. denied,
 
 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981);
 
 Field v. Volkswagenwerk AG,
 
 626 F.2d 293, 296 (3d Cir.1980);
 
 Ed & Fred, Inc. v. Puritan Marine Ins. Underwriters Corp.,
 
 506 F.2d 757, 758 (5th Cir.1975).
 
 [3]
 

 As noted, however, Congress amended the diversity statute in 1988 to add what now appears as the last sentence of 28 U.S.C. § 1332(a). This sentence provides in pertinent part that for the purposes of § 1332(a) “an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.” Under this amendment, diversity of citizenship no longer exists in an action between a citizen of State A and an alien admitted to the United States for permanent residence who resides in State A. Read literally, however, the amended statute would create diversity between Saadeh and both FarouMs. As permanent residents of Maryland at the time Saadeh filed his complaint, Mr. and Mrs. Farouki would be “deemed” citizens of Maryland. Thus the amended statute would also appear to abrogate partially the rule of complete diversity by permitting a non-resident alien and a resident alien to be present on opposite sides of this lawsuit. Courts and commentators have differed as to whether this latter result is permissible under the amended statute.
 
 Compare Singh v. Daimler-Benz AG,
 
 9 F.3d 303, 309-310 (3d Cir.1993),
 
 with Lloyds Bank PLC v. Norkin,
 
 817 F.Supp. 414, 418-19 (S.D.N.Y.1993),
 
 and Aral v. Tachibana,
 
 778 F.Supp. 1535, 1543 (D.Haw.1991);
 
 see also
 
 1 James Wm. Moore, Moore’s Federal PRACTICE ¶ 0.74[2.-l] (2d ed.1991); 13B Charles Alan Wright et al., Federal Practice
 
 &
 
 Procedure § 3604 (1984 & Supp.1996); David D. Siegel,
 
 Commentary on 1988 Revision,
 
 28 U.S.C.A. § 1332, at 8 (West 1993); Richard Bisio,
 
 Changes in Diversity Jurisdiction and Removal,
 
 69 Mich. B.J. 1026, 1027-1028 (1990). Before addressing this complex issue of statutory interpretation, we first examine whether any post-filing events cured the possible jurisdictional defects and thus eliminate the need to address the 1988 amendment.
 

 A.
 

 At the time Saadeh filed his complaint, the constitutional requirement of minimal diversity was satisfied because Saadeh, an alien domiciled in Greece, and L.R. Holdings, a District of Columbia corporation, were opposing parties to the lawsuit.
 
 [4]
 
 For
 
 *-1520
 
 purposes of Article III, the lawsuit could properly be brought in federal court as a dispute between an alien and a citizen of a State. The statutory requirement of complete diversity was not satisfied, however, because of the presence of Saadeh and Dina-vest, both aliens, on opposite sides of the litigation.
 
 [5]
 

 See Eze,
 
 782 F.2d at 1065. In addition, there were two other potential defects caused by the presence of Mr. and Mrs. Farouki, both of whom were aliens.
 

 Any jurisdictional defects caused by the presence of Mrs. Farouki and Dinavest as defendants were cured when they were dismissed from the case prior to trial, pursuant to the joint stipulation of the parties.
 
 [6]
 
 It is well settled that a district court has authority under Rule 21 of the Federal Rules of Civil Procedure to dismiss a dispensable, non-diverse party at any time, even after a judgment has been rendered.
 
 [7]
 

 Newman-Green, Inc. v. Alfonzo-Larrain,
 
 490 U.S. 826, 832, 109 S.Ct. 2218, 2223, 104 L.Ed.2d 893 (1989). The third potential impediment to complete diversity, arising from Faroukfis status as an alien when Saadeh filed his complaint, is not so easily resolved.
 

 Saadeh contends that because Farouki became a United States citizen by the time of trial the district court had jurisdiction under § 1332(a)(2). If this were true, then the court need not consider whether he was a “citizen of a State” under the diversity statute, by virtue of his permanent resident status, at the time Saadeh filed his complaint. Farouki points out, however, that even though he became a United States citizen, he was not a citizen of any state for purposes of § 1332(a) because he subsequently established domicile in Egypt. To qualify as a “citizen of a State” for the purposes of § 1332(a), a natural person must be both a citizen of the United States and be domiciled within a particular state.
 
 Newman-Green,
 
 490 U.S. at 828, 109 S.Ct. at 2221. Thus, even were the court to recognize the change in citizenship, it would be essential for Saa-deh to demonstrate that Farouki retained his Maryland domicile.
 

 We conclude, however, that Farouki’s change in citizenship and possible change in domicile could not cure a defect in complete diversity if one existed at the time Saadeh
 
 *-1519
 
 filed his complaint. It is well established that diversity of citizenship is determined at the time the complaint is filed.
 
 See, e.g., Freeport-McMoRan, Inc. v. K N Energy, Inc.,
 
 498 U.S. 426, 428, 111 S.Ct. 858, 859-60, 112 L.Ed.2d 951 (1991). Thus, if parties are diverse at the time of filing, a subsequent change in citizenship or domicile will not divest the court of jurisdiction.
 
 Id.; Smith v. Sperling,
 
 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957);
 
 Mollan v. Torrance,
 
 22 U.S. (9 Wheat) 537, 539, 6 L.Ed. 154 (1824). Professors Wright, Miller and Cooper suggest that the rationale for this bright-line rule is premised on “pro-vid[ing] maximum stability and certainty to the viability of the action and minimiz[ing] repeated challenges to the court’s subject matter jurisdiction.” 13B WRIGHT et al.,
 
 supra,
 
 § 3608, at 452. Were it necessary to track changes of citizenship throughout litigation, courts would face potentially difficult burdens of either holding cases in abeyance for the diversity requirements to be satisfied or, alternatively, repeatedly adjudicating challenges to previous determinations that diversity jurisdiction existed. The bright-line rule also provides “a uniform test that is relatively easy to apply.”
 
 Id.
 
 The corollary to this rule, that if diversity did not exist when the complaint was filed, it cannot be created by a change of domicile by one of the parties or some other event, appears equally sound and equally well settled.
 
 See Anderson v. Watts,
 
 138 U.S. 694, 702-03, 708, 11 S.Ct. 449, 451, 453, 34 L.Ed. 1078 (1891);
 
 Faysound Ltd.,
 
 878 F.2d at 296;
 
 Oliney v. Gardner,
 
 771 F.2d 856, 858 (5th Cir.1985);
 
 Field,
 
 626 F.2d at 304;
 
 Lyons v. Weltmer,
 
 174 F.2d 473 (4th Cir.),
 
 cert. denied,
 
 338 U.S. 850, 70 S.Ct. 93, 94 L.Ed. 520 (1949); 13B WRIGHT et al. § 3608, at 458.
 

 Saadeh cites a number of cases involving removal for the proposition that the court may take account of FarouM’s change in citizenship, but neither these cases nor the Supreme Court’s recent decision in
 
 Caterpillar, Inc. v. Lewis,
 
 — U.S.—, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996), support this view. Rather, these cases are consistent with the rule that a district court may cure a jurisdictional defect by dismissing a dispensable, non-diverse party pursuant to Rule 21.
 
 See Newman-Green,
 
 490 U.S. at 832, 109 S.Ct. at 2222-23. In
 
 Caterpillar,
 
 a removal case involving non-diverse parties, the district court denied a timely motion to remand and entered judgment following a jury trial. The Supreme Court, noting that there was complete diversity at the time of trial as the result of a settlement resulting in dismissal of the non-diverse defendant, allowed the judgment to stand on the ground that considerations of finality, efficiency, and economy were paramount. — U.S. at—, 117 S.Ct. at 476;
 
 see also Grubbs v. General Electric Credit Corp.,
 
 405 U.S. 699, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972);
 
 American Fire & Casualty Co. v. Finn,
 
 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951). Similarly, in
 
 Knop v. McMahan,
 
 872 F.2d 1132 (3d Cir.1989), the Third Circuit allowed a judgment to stand where the parties were not completely diverse at the time an action was removed, but the interests of three limited partners in one of the defendants were subsequently terminated, creating complete diversity.
 
 Id.
 
 at 1137-38. Although we are mindful of the “considerations of finality, efficiency and economy” that concerned the Supreme Court in
 
 Caterpillar,
 
 those concerns in the removal context are insufficient to warrant a departure here from the bright-line rule that citizenship and domicile must be determined as of the time a complaint is filed. Indeed, the instant case demonstrates the value of a bright-line rule; even on appeal the parties continue to develop new theories and proffer new evidence on citizenship and domicile.
 

 B.
 

 Thus, the remaining question is whether, at the time Saadeh filed his complaint, Farouki qualified as a “citizen of a State” under the 1988 amendment to § 1332. In resolving a question of statutory interpretation, a court’s starting point is always the language of the statute.
 
 Commissioner of Internal Revenue v. Engle,
 
 464 U.S. 206, 214, 104 S.Ct. 597, 603, 78 L.Ed.2d 420 (1984). If the language is plain on its face, courts do not ordinarily resort to legislative history.
 
 Garcia v. United States,
 
 469 U.S. 70, 76 n. 3, 105 S.Ct. 479, 483 n. 3, 83 L.Ed.2d 472 (1984);
 
 Independent U.S. Tanker Owners Comm. v.
 
 
 *-1518
 

 Skinner,
 
 884 F.2d 587, 596 (D.C.Cir.1989),
 
 cert. denied,
 
 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990). Nevertheless, there are exceptions. For example, the Supreme Court has observed that “in rare cases, the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling.”
 
 Griffin v. Oceanic Contractors, Inc.
 
 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). “Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent.with Congress’ intention, since the plain-meaning rule is ‘rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.’ ”
 
 Public Citizen v. U.S. Dep’t of Justice,
 
 491 U.S. 440, 455, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) (quoting
 
 Boston Sand & Gravel Co. v. United States,
 
 278 U.S. 41, 48, 49 S.Ct. 52, 53, 73 L.Ed. 170 (1928)). Consequently, “[w]here the literal reading of a statutory term would ‘compel an odd result,’ ... we must search for other evidence of congressional intent to lend the term its proper scope.”
 
 Id.
 
 (quoting
 
 Green v. Bock Laundry Mach. Co.,
 
 490 U.S. 504, 509, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989));
 
 see also Associated Gen. Contractors v. California State Council of Carpenters,
 
 459 U.S. 519, 529-31, 103 S.Ct. 897, 903-05, 74 L.Ed.2d 723 (1983);
 
 Engine Mfrs Ass’n. v. EPA,
 
 88 F.3d 1075, 1088-89 (D.C.Cir.1996);
 
 American Scholastic TV Programming Found. v. FCC,
 
 46 F.3d 1173, 1180 (D.C.Cir. 1995); 2A NORMAN J. Singer, Sutherland Statutory Construction, § 45.12, at 54 (4th ed.1984). In addition, the Supreme Court has instructed that “where an otherwise acceptable construction of a statute would raise serious constitutional problems,” a court should “construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.”
 
 Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,
 
 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). While a court “cannot press statutory construction ‘to the point of disingenuous evasion,’ even to avoid a constitutional question,”
 
 United States v. Locke,
 
 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985) (quoting
 
 Moore Ice Cream Co. v. Rose,
 
 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933)), where the evidence of congressional intent supports an interpretation that avoids such problems, the court will adopt it.
 
 See Public Citizen,
 
 491 U.S. at 465-67, 109 S.Ct. at 2572-73.
 

 A literal reading of the 1988 amendment to § 1332(a) would produce an odd and potentially unconstitutional result. It would both partially abrogate the longstanding rule of complete diversity, and create federal diversity jurisdiction over a lawsuit brought by one alien against another alien, without a citizen of a state on either side of the litigation. The judicial power of the United States does not extend to such an action under the Diversity Clause of Article III.
 
 Hodgson v. Bowerbank,
 
 9 U.S.(5 Cranch) 303, 3 L.Ed. 108 (1809);
 
 see also
 
 Moore,
 
 supra,
 
 ¶ 0.75[1.-2-2], at 800.38 to .39; 13B Wright et al.,
 
 supra,
 
 § 3604, at 384. Under the circumstances, it behooves the court to examine the legislative history of the 1988 amendment in order to determine congressional intent.
 

 The 1988 alienage amendment was added to the Judicial Improvements Act during the Senate debate, and the legislative' history consists of what is in the Congressional Record. So far as appears, the idea for the addition of an alienage provision originated in a recommendation of the Judicial Conference of the United States.
 
 [8]
 

 See
 
 Report of THE PROCEEDINGS OF THE JUDICIAL CONFERENCE of the United States 76-77 (Sept. 14, 1988). The Judicial Conference supported the addition of the alienage provision in order to restrict diversity jurisdiction:
 

 There is no reason why actions involving persons who are permanent residents of the United States should be heard by federal courts merely because one of them remains a citizen or subject of a foreign state or has not yet become a citizen of the United States. Accordingly, the Confer-
 
 *-1517
 
 enee agreed to recommend that Congress amend 28 U.S.C. § 1332(a) to treat a permanent resident alien as a citizen of the state of his or her domicile.
 

 Id.
 
 at 77. The intentions of the Judicial Conference are mirrored by the comments of Senator Heflin, the sponsor of the Senate bill, during the debate on the Judicial Improvements Act. Referring to Title II, on diversity jurisdiction, he stated:
 

 The provisions of this title make modest amendments to reduce the basis for Federal court jurisdiction based solely on diversity of citizenship....
 

 This title makes three changes in the diversity area: It increases the amount in controversy from $10,000 to $50,000; it treats permanent resident aliens in the United States as citizens of the State of domicile; and it provides that citizenship in representative party cases ... is determined by reference to the citizenship of the “represented” party.
 

 131 Cong. Rec. at 31,051 (1988). A seetion-by-section analysis introduced into the Congressional Record similarly reveals the intent to reduce diversity jurisdiction through the alienage provision. Describing Title II as “mak[ing] modest adjustments to the scope of diversity jurisdiction to relieve the caseload pressures on the Federal Courts,” the analysis paralleled the language of the Judicial Conference report:
 

 28 U.S.Ci § 1332(a)(2) currently gives the district courts diversity jurisdiction over actions between citizens of a State and citizens or subjects of a foreign state. Diversity jurisdiction exists under this provision even though the alien may have been admitted to the United States as a permanent resident. As any review of the immigration statistics indicates, large numbers of persons fall within this category.
 

 There is no apparent reason why actions between persons who are permanent residents of the same State should be heard by Federal courts merely because one of them remains a citizen or subject of a foreign state.
 

 Id.
 
 at 31,054.
 

 In addition to the rationale advanced for the alienage provision, the legislative history of the Judicial Improvements Act makes clear that Congress focused on reducing the caseload of the federal courts by contracting the scope of diversity jurisdiction. The House Judiciary Committee Report indicated that Congress had taken great steps to improve the administration of justice since 1977, when “[fjederal courts were ... overloaded with cases and access to justice suffered from an inadequate number of judges.” H.R. Rep. No. 100-889, at' 22 (1988),
 
 reprinted in
 
 1988 U.S.C.C.A.N. 5982, 5983. The Report noted, however, that the federal judiciary was still “beset by problems,” including “delay caused by rising caseloads and insufficient support services; spiraling costs caused by litigation expenses and attorneys’ fees; and unfair and inconsistent decision[s] caused by the pressures placed on judges who must cope with the torrent of litigation.”
 
 Id.
 
 at 23,1988 U.S.C.C.A.N. at 5984.
 

 Against this background, the House Report outlined a plan for diversity reform.
 
 Id.
 
 at 44, 1988 U.S.C.C.A.N. at 6005. It noted that:
 

 Legislative efforts to eliminate or reduce diversity jurisdiction in the Federal courts come to the fore at various intervals. The Judicial Conference of the United States has long supported total abolition of diversity jurisdiction, as well as measures short of total elimination, such as eliminating instate plaintiff suits and raising the jurisdictional amount. It has always been a controversial endeavor.... [I]n the late 1970’s through the leadership of Congressman Kastenmeier, the House voted to eliminate diversity jurisdiction — an effort that failed to achieve meaningful diversity reform in conference by the closest of measures.
 

 The activity surrounding this issue in this Congress carries on the tradition. The Subcommittee on Courts, Civil Liberties, and the Administration of Justice adopted an amendment to generally abolish diversity of citizenship. The resolution
 
 *-1516
 
 of this debate by the Committee was to vote to increase the amount in controversy for diversity jurisdiction from $10,000 to $50,000.
 

 Id.
 
 The House Judiciary Committee noted that proponents of this reform anticipated that it would reduce the federal diversity caseload by up to 40 percent.
 
 Id.
 
 at 45,1988 U.S.C.C.A.N. at 6006.
 

 Given the reasoning underlying the recommendation for the alienage provision and the general expressions of legislative intent for the Judicial Improvements Act, in the absence of contrary evidence, we conclude that Congress intended to contract diversity jurisdiction through the 1988 amendment to § 1332(a), not to expand it by abrogating the longstanding .rule that complete diversity is destroyed in lawsuits between aliens. Like the district courts in
 
 Lloyds Bank
 
 and
 
 Arai,
 
 we do not view these concerns about the workload of the federal judiciary and the burdens imposed by diversity jurisdiction as consistent with the conclusion that Congress intended what a literal reading of the statute suggests. It would be illogical to conclude that Congress intended to eliminate diversity jurisdiction in cases between a citizen and an alien permanently residing in the same state, but simultaneously intended to expand diversity jurisdiction in cases between an alien permanently residing in one state and an alien permanently residing in another state. Despite the plain language of § 1332(a), the alienage amendment- “clearly appears to have been intended only to eliminate subject matter jurisdiction of cases between a citizen and an alien living in • the same state.”
 
 Lloyds Bank,
 
 817 F.Supp. at 419. There is no reason to conclude, however, that the amendment was intended to create diversity jurisdiction where it did not previously exist. Like
 
 Public Citizen,
 
 this appears to be one of those rare cases where the most literal interpretation of a statute is at odds with the evidence of Congressional intent and a contrary construction is necessary to avoid “formidable constitutional difficulties.” 491 U.S. at 463, 466, 109 S.Ct. at 2571, 2573.
 

 The Third Circuit reached a contrary conclusion in
 
 Singh,
 
 9 F.3d 303. It reasoned that although “Congress may not have intended to enlarge diversity jurisdiction, ... the possible unintended effect of permitting a permanent resident alien to invoke diversity jurisdiction when that party could not have done so before the amendment is not sufficient reason for us to torture or limit the statutory language.”
 
 Id.
 
 at 309. The Third Circuit concluded that the legislative history of the Judicial Improvements Act did not provide an “overriding reason” to depart from the plain language of § 1332(a).
 
 Id.
 
 at 310. In particular, the court rejected the claim that the overall purpose of the Act was to “to reduce diversity jurisdiction to relieve caseload pressures.”
 
 Id.
 
 at 307. Rather, it viewed the Act, in Senator Heflin’s words, as “a noncontroversial judicial improvements bill with many authors.”
 
 Id.
 
 at 309 (quoting 134 Cong. Rec. 31,050 (1988)). Although acknowledging that there was “ample basis in the report of the [Judicial Conference] Committee to support [the] view that reduction of the diversity caseload was a factor in the proposed change as to the treatment of permanent resident aliens,” the court concluded that “[i]t is far less clear that the Judicial Conference Committee’s perspective represented the view of the Senate.”
 
 Id.
 
 at 308. In view of the Senate’s “focus[ ] on the incongruity of permitting a permanent resident alien living next door to a citizen to invoke federal jurisdiction for a dispute between them while denying a citizen across the street the same privilege,” the Third Circuit was unwilling to “jump from the ‘modest’ adjustment to the scope of diversity jurisdiction ... to [a] claim that construing the alien permanent resident provision according to its plain language would contravene the legislative intent.”
 
 Id.
 
 at 309.
 

 Respectfully, we conclude that the Third Circuit gave insufficient attention to the statements in the legislative history on the purpose of the 1988 amendment. Despite the reference in the legislative history indicating that Congress intended to eliminate complete diversity in lawsuits between a citizen and an alien admitted for permanent residence in the same state, that is not the whole history. The diversity provisions of
 
 *-1515
 
 the Judicial Improvements Act were enacted after more than a decade of congressional debate on the continuing need for diversity-jurisdiction in light of the heavy caseload of the federal courts.
 
 See
 
 134 Cong. Rec. at 31,050. The Judicial Conference’s recommendation was premised on the need for a reduction in diversity jurisdiction, and the House bill, which provided for the same increase of the amount-in-eontroversy requirement as the Senate bill, was evidently a compromise between those who wished to abolish diversity jurisdiction almost entirely, and those who wished to retain it.
 
 Id.;
 
 H. Rep. at 44, 1988 U.S.C.C.A.N. at 6005. In adding the alienage provision, the Senate, and ultimately the Congress, evidenced a purpose consistent with the policies of the other diversity reforms. There is no evidence to the contrary. Although its overall goal, as the Third Circuit noted, was to improve the administration and efficiency of the federal courts, with regard to diversity the Judicial Improvements Act was designed to contract the scope of jurisdiction.
 

 Moreover, the Third Circuit’s refusal to give credence to the evidence of congressional intent means that Congress would have acted without regard to the potential constitutional ramifications of its action or was unpersuaded of the existence of such ramifications. Neither conclusion seems warranted. It is unlikely that the Judicial Conference would have been oblivious to this concern. Nor is it reasonable to presume that were adoption of the alienage provision to create a possibility of a serious constitutional issue neither the Judicial Conference nor a Member of Congress would have voiced concern. Given the effect of a literal reading of the 1988 amendment on well-settled law regarding both minimal and complete diversity in suits involving aliens, a description of the amendment as a “modest” or “noncontroversial” revision to diversity jurisdiction would hardly have fit.
 

 Heeding the 1988 amendment’s legislative history avoids a potential constitutional problem. Combined with evidence of the general congressional effort to reduce diversity jurisdiction and the limited purpose of the 1988 amendment envisioned in the section-by-section analysis, several district courts have interpreted § 1332 in a manner contrary to the Third Circuit’s decision in
 
 Singh,
 
 9 F.3d 303.
 
 See Buti v. Impressa Perosa, S.R.L.,
 
 935 F.Supp. 458, 463 (S.D.N.Y.1996);
 
 A.T.X. Export, Ltd. v. Mendler,
 
 849 F.Supp. 283, 284 (S.D.N.Y.1994);
 
 Lloyds Bank,
 
 817 F.Supp. at 419;
 
 Arai,
 
 778 F.Supp. at 1543. We agree with these courts, and conclude that the 1988 amendment to § 1332 did not confer diversity jurisdiction over a lawsuit between an alien on one side, and an alien and a citizen on the other side, regardless of the residence status of the aliens.
 

 Accordingly, we hold that the district court lacked subject matter jurisdiction because Farouki’s acquisition of United States citizenship after Saadeh filed his complaint could not cure the defect, and we vacate the judgment and remand the case to the district court with instructions to dismiss the complaint for lack of subject matter jurisdiction; we do not reach the parties’ other contentions.
 

 [1]
 

 . Although the record is somewhat unclear, Farould testified that he and his wife became citizens in mid-1993 and mid-1992, respectively. Because United States citizenship requires a five-year period of permanent residence in the United States, 8 U.S.C. § 1427(a), it is reasonable to conclude that both Faroukis were permanent residents of Maryland when Saadeh filed his complaint.
 

 [2]
 

 . When Saadeh filed his complaint, 28 U.S.C. § 1332(a) provided in pertinent part:
 

 The district courts shall have original jurisdiction of all civil actions where the matter in
 
 *-1521
 
 controversy exceeds the sum or value of $50,-000, exclusive of interest and costs, and is between—
 

 (1) citizens of different States;
 

 (2) citizens of a State and citizens or subjects of a foreign state;
 

 (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
 

 (4) a foreign state ... as plaintiff and citizens of a State or of different States.
 

 For purposes of this section ... an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.
 

 [3]
 

 . We need not decide whether § 1332(a)(3) would confer jurisdiction over an action involving a citizen of a state and an alien on one side, and a citizen of a different state and an alien on the other side.
 
 See Ed & Fred,
 
 506 F.2d at 758, 13B Chaex.es Alan Wright et al.. Federal Practice and Procedure, § 3604, at 390-91 (1984).
 

 [4]
 

 . Under the diversity statute, a corporation is deemed to be a citizen of any state in which it is incorporated and in the state in which it has its principal place of business. 28 U.S.C. § 1332(c). The District of Columbia is deemed a state for diversity purposes.
 
 Id.
 
 § 1332(d);
 
 see National Mut. Ins. Co. v. Tidewater Transfer Co.,
 
 337 U.S.
 
 *-1520
 
 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949). Although the record is unclear as to where L.R. Holdings had its principal place of business, Far-ouki states in his brief that it was “a defunct District of Columbia corporation.” As to the parties’ assertion that L.R. Holdings was “defunct” or “apparently defunct” as it filed no answer to the complaint, the record provides no support for the assertion. Our analysis proceeds, therefore, on the basis that L.R. Holdings existed for jurisdictional purposes; were it non-extant when Saadeh filed his complaint, not even minimal diversity would exist.
 

 [5]
 

 . This court has yet to decide whether an alien corporation is deemed a citizen of its principal place of business for purposes of the diversity statute.
 
 See Jerguson v. Blue Dot Investment, Inc.,
 
 659 F.2d 31, 35 (5th Cir. Unit B Oct.1981),
 
 cert. denied,
 
 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982);
 
 see generally
 
 13B Charles Alan Wright et al., Federal Practice and Procedure, § 3628 (1984). In any event, because Dinavest was incorporated in the United Kingdom and had its principal place of business outside the United States, it was an alien.
 

 [6]
 

 . Although Farouki stipulated to the dismissal of Dinavest, he now contends that dismissal of the instant lawsuit is required because Dinavest is an indispensable party as a primary obligor under the loan agreement at issue. Having entered into a joint stipulation agreeing to dismissal in the district court, Farouki would normally be estopped from claiming error on appeal.
 
 See FDIC v. St. Paul Fire & Marine Ins. Co.,
 
 942 F.2d 1032, 1038 (6th Cir.1991);
 
 National Union Fire Ins. Co. v. Woodhead,
 
 917 F.2d 752, 757 (2d Cir. 1990);
 
 United States v. New England Teamsters & Trucking Indus. Pension Fund, Til
 
 F.2d 1274, 1278 (2d Cir.1984). Of course, an appellate court may
 
 sua sponte
 
 consider whether a parly is indispensable even when that issue has not been raised at trial.
 
 See Freeman v. Northwest Acceptance Corp.,
 
 754 F.2d 553, 559 (5th Cir. 1985);
 
 McCulloch v. Glasgow,
 
 620 F.2d 47, 51 (5th Cir. 1980);
 
 Quabaug Rubber Co. v. Fabiano Shoe Co.,
 
 567 F.2d 154, 158 n. 4 (1st Cir. 1977). But, even if the court were inclined to ignore the stipulation, we would conclude that the record provides no basis from which to conclude that Dinavest is indispensable.
 
 See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,
 
 11 F.3d 399, 405 (3d Cir.1993);
 
 see also Kickapoo Tribe
 
 v.
 
 Babbitt,
 
 43 F.3d 1491 (D.C.Cir.1995); 7 Wright et
 
 al., supra,
 
 § 1613, at 185.
 

 [7]
 

 .Fed.R.Civ.P. 21 provides in pertinent part:
 

 Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.
 

 [8]
 

 . Senator Heflin, a sponsor of the Senate bill, acknowledged the close working relationship with, among others, the Judicial Conference in developing the Judicial Improvements Act. 134 Cong. Rec. 31,050 (1988).