John KARAZANOS and Yiannis, Inc., Plaintiffs–Appellants,

v.

MADISON TWO ASSOCIATES, Defendant–Appellee.

No. 96–4170.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1997.

Decided June 23, 1998.

Christopher V. Langone (argued), Chicago, IL, for Plaintiff–Appellant.

David G. Lynch (argued), Kristi Lynn Nelson, Rudnick & Wolfe, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and EASTERBROOK and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This case began as a simple contract dispute between the plaintiffs, John Karazanos and his corporation Yiannis, Inc., and the defendant, Madison Two Associates, a general partnership that owned the building in which Yiannis operated a restaurant. Like many similar cases, it started out in state court, was removed to federal court, and was eventually dismissed on summary judgment for the defendant. See *Yiannis, Inc. v. Madison Two Assocs.*, No. 95–C–6704, 1996 WL 680239 (N.D.Ill. Nov. 21, 1996). In addition to arguing that the district court erred in granting summary judgment, Karazanos (the name we will use for both plaintiffs) argues that the district court never had proper subject matter jurisdiction over the re-

moved action. We take up the jurisdictional challenge first, as we must. See *Steel Co. v. Citizens for a Better Env't*, — U.S. —, — – —, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998).

When the case started in the Circuit Court of Cook County (Illinois), there were two plaintiffs: John Karazanos, a citizen of Illinois, and Yiannis, an Illinois corporation with its principal place of business—a Mediterranean restaurant on the ground floor of Three First National Plaza in Chicago—in Illinois. The defendant was Madison Two Associates, a general partnership and complex umbrella organization for 18 other partnerships, individuals, and corporations. Madison Two removed the case to federal court in November 1995. Only two facts about the notice of removal are important here. First, as is required, the notice furnished the names and citizenships of every partner in every partnership involved in the case. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). Second, in several instances the notice indicated that someone was "a foreign citizen," but it did not specify the country of citizenship nor did it indicate where that individual was domiciled.

At the request of the district court, Madison Two supplemented its jurisdictional allegations in the removal notice by furnishing the court with a letter and a hand-drawn organizational chart from counsel that more clearly described the relationships among all the entities. In addition, in support of its motion for summary judgment Madison Two submitted an affidavit from Jeanine Hutchens, in which she described all of the relevant citizenships based on her personal knowledge. (Although the record reflects that Jeanine Hutchens worked as a senior tax manager at a limited partnership named "Hines Interests Limited Partnership," that entity is not a subentity under the Madison Two umbrella. Aside from using a name similar to several of the Madison Two subentities, the record is silent on her employer's relationship to the defendant and the basis of her personal knowledge of Madison Two's organizational structure.) This information satisfied the district court that jurisdiction was proper, and it proceeded to grant

Madison Two's motion for summary judgment.

It is never too late, of course, to raise a jurisdictional challenge, and so we can and must consider the plaintiff's challenge to the district court's jurisdiction. Karazanos first misleadingly complains that Madison Two "disregarded" the district court's inquiry about the citizenship of the limited partners. This is simply untrue. Madison Two responded both in the December 7, 1995, letter from its counsel to the court, and in the Hutchens affidavit submitted at summary judgment. Despite Karazanos's protestations, it is irrelevant that Madison Two's letter responding to Judge Coar's informal inquiry was unsworn and not made part of the record. At the time Judge Coar made his inquiry, no one had suggested that Madison Two's jurisdictional allegation was deficient, and his minute order did not require a pleading to be filed. Indeed, considering a district court's broad discretion to consider "whatever evidence has been submitted" when deciding a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993) (per curiam), Judge Coar's purely prophylactic inquiry into the jurisdictional facts here was quite reasonable. Karazanos never put Madison Two to its proof by seeking jurisdictional discovery. Cf. *Anthony v. Security Pac. Fin. Svcs., Inc.*, 75 F.3d 311, 316–17 (7th Cir.1996). Nor did Karazanos directly contest by a Rule 12(b)(1) motion or otherwise the truth of any of the alleged jurisdictional facts. Cf. *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 & n. 3 (7th Cir.1979). In fact, counsel for Karazanos conceded at oral argument that the plaintiffs do not challenge the truth of those facts even now. A court may accept the uncontested, good faith allegations of jurisdictional facts, *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir.1995), though of course it may also notice a jurisdictional defect sua sponte. *Grafon*, 602 F.2d at 783 n. 4 (7th Cir.1979). After deliberating, Judge Coar permissibly chose the former instead of requiring further exploration into the facts.

Karazanos also argues in passing that at summary judgment he obliquely put the jurisdictional issue into play because his response to Madison Two's proposed facts stated that he was "without knowledge or information sufficient ... to form a belief as to the truth" of certain jurisdictional facts. Some of these jurisdictional facts, he speculates, might have been untrue. This argument is also unpersuasive. Under Local Rule 12(N), "[a]ll material facts set forth in [Madison Two's 12(M) statement are] ... deemed to be admitted unless controverted." Thus, by the very language of Local Rule 12(N), Karazanos's equivocation was an admission, not a denial. Also, there is a critical difference between a statement that "Jurisdictional fact X could be wrong," and an allegation that "Jurisdictional fact X is wrong." The former is pure guesswork, while the latter is a falsifiable claim. Because a disproved statement of fact can in some circumstances lead to sanctions, see, e.g., Fed.R.Civ.P. 11, parties and counsel will choose carefully before committing themselves. Finally, if Karazanos lacked information to contest certain jurisdictional facts and truly doubted their veracity, he should have moved for additional discovery under Rule 56(f). He never did so, and thus, having failed throughout to contravene Madison Two's jurisdictional allegations, he cannot blindly speculate here about Jeanine Hutchens's competence to testify about Madison Two's organizational structure. Although Hutchens was not employed by an entity organized under the Madison Two umbrella, she swore to being a senior tax manager at the "Hines Interests Limited Partnership," an entity that in the absence of allegations otherwise, Judge Coar could reasonably have inferred was related in some way to one of the 10 entities and individuals organized under the Madison Two rubric that used the name "Hines." See Fed.R.Civ.P. 56(e).

The more difficult question is whether the facts as Judge Coar found them satisfied the jurisdictional requirements of 28 U.S.C. § 1332(a)(3). The only allegations that were at all vague were the ones labeling certain individuals as "foreign citizen[s]." Although a suit between aliens falls outside § 1332's jurisdictional grant, see, e.g., *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed.

108 (1809) (alien v. alien), jurisdiction exists in a suit between citizens of different states where aliens are additional parties. See 28 U.S.C. § 1332(a)(3); *Hunter v. Shell Oil Co.*, 198 F.2d 485, 488 (5th Cir.1952) (citizen of state A v. citizen of state B + alien); *Allendale Mut. Ins. v. Bull Data Sys.*, 10 F.3d 425, 427–28 (7th Cir.1993) (citizen of state A + alien v. citizen of state B + alien). (We noted in *Allendale* that courts have rejected jurisdiction in suits where "one side of the litigation had only foreign parties and the other had a mixture of foreign and domestic parties," because such a case does not fit within any of the statute's jurisdictional pigeonholes. 10 F.3d at 428. See also *Israel Aircraft Indus. v. Sanwa Business Credit*, 16 F.3d 198, 202 (7th Cir.1994) (rejecting jurisdiction in a suit following the pattern of alien v. citizen + alien). Supplemental jurisdiction is also apparently unavailable to bring in the extra alien, because it specifically does not extend to jurisdiction over persons made parties pursuant to Rules 14, 19, 20,. and 24 when the case is based on § 1332.)

The statute does not say anything about specifying from which foreign state an alien hails, and so on its face it does not appear to demand more than an allegation that someone is "a foreign citizen or subject." Cf. *Dresser Indus. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 500 (3d Cir.1997) ("For diversity purposes, an alien is an alien is an alien."). See generally 13B Charles Alan Wright et al., Federal Practice & Procedure § 3604, at 396 (2d ed. 1984) ("[I]f the allegation of alien citizenship is plain, technicalities are unimportant."), citing *C.H. Nichols Lumber Co. v. Franson*, 203 U.S. 278, 282–83, 27 S.Ct. 102, 51 L.Ed. 181 (1906) (irrelevant to jurisdiction that plaintiff described himself as a "citizen" of Sweden even though he was properly a "subject" of that country's monarchy). The only complication occurs because of a 1988 amendment to § 1332(a), which added the following language:

> For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.

See Judicial Improvements and Access to Justice Act of 1988, Pub.L. 100–702, 102 Stat. 4642 (1988) (codified at 28 U.S.C. § 1332(a)). Because of this provision, it is possible that an individual might be a citizen or subject of a foreign state but nevertheless be someone deemed a citizen-for-jurisdiction of one of the United States, if that individual is a permanent resident alien domiciled in a particular state.

We do not know from the present record whether the people denominated as "citizen[s] of ... foreign state[s]" in Madison Two's Notice of Removal were domiciled in their native countries, in a third country, or perhaps in the state of Illinois. If they were permanent resident aliens domiciled in Illinois, then the effect of the final paragraph of § 1332(a) would be to destroy complete diversity. Cf. *Foy v. Schantz, Schatzman & Aaronson*, 108 F.3d 1347, 1349–50 (11th Cir. 1997) (diversity would have been destroyed in suit between Florida citizen and alien residing in Florida if alien had attained permanent resident status). Indeed, this appears to be what Congress had in mind when it passed the 1988 amendment to the statute. See 134 Cong. Rec. S16,299 (daily ed. Oct. 14, 1988) (section-by-section analysis). See generally *Saadeh v. Farouki*, 107 F.3d 52, 58–60 (D.C.Cir.1997) (detailed compilation of legislative history fragments); John B. Oakley, Recent Statutory Changes in the Law of Federal Jurisdiction and Venue: The Judicial Improvements Acts of 1988 and 1990, 24 U.C. Davis L.Rev. 735, 741–45 (1991). Congress wanted to eliminate the ability of permanent resident aliens to sue in federal court on all manner of claims using the alienage jurisdiction, when the case was more properly viewed as a local matter analogous to a case between citizens of the same state. See Oakley, *id.* at 741–42 n. 14 (analysis of amendment's sparse legislative history). Thus, when an alien permanently residing in Illinois wanted to sue on a contract with a U.S. citizen domiciliary of Illinois, the effect of the amendment was to force that case into the state courts, which is where it would be for any other two Illinois citizens.

■ We must therefore decide whether the hypothetical possibility that one of the

"foreign citizen[s]" may be a permanent resident alien in Illinois is enough to render Madison Two's jurisdictional allegations defective. In order to reach that conclusion, we would have to hold that the party seeking federal jurisdiction (here, the defendant, because the context is removal) must not only allege that certain parties are foreign citizens or subjects, but must also allege that they are not permanent residents of the United States. Nothing in the Appendix of Forms to the Federal Rules of Civil Procedure supports imposing this kind of pleading burden, see Fed.R.Civ.P. 84, Form 2 ("Allegation of Jurisdiction"), perhaps because these cases are still relatively rare. Typically the party seeking jurisdiction pleads the jurisdictional facts required—A is a citizen of Idaho, the amount in controversy exceeds $75,000, B is a citizen of France—and it is up to the party opposing federal jurisdiction to contest the facts as pleaded. Challenges to amounts in controversy are certainly not unknown, and some succeed when the party seeking federal jurisdiction fails to support its allegations properly. See *Wellness Community Nat'l v. Wellness House*, 70 F.3d 46, 49–50 (7th Cir. 1995). For example, if A is a student attending school in Idaho but her parents live in Texas, the opposing party may wish to contest the allegation that A is a domiciliary and citizen of Idaho.

■ Because of the final paragraph of § 1332, some aliens will have two "citizenships" for diversity purposes rather than one: that of their home country, and that of the U.S. state in which they are domiciled. Dual citizenship is not unknown in the statute, of course: in cases with corporate parties, it is necessary to allege both the state of incorporation and the state of the principal place of business, even if they are one and the same. See § 1332(c). But the difference between the treatment of corporations and the treatment of aliens is important. The statute assumes that corporations will always have both a place of formal incorporation and a principal place of business, and thus it requires both to be alleged. Most aliens, by contrast, will not be lawful permanent residents of the United States and will thus have only one citizenship that is jurisdictionally relevant. Although it would be possible to

read the final proviso of § 1332(a) to require every allegation of alienage jurisdiction to include either the phrase "and X is not an alien admitted to the United States for permanent residence" or the phrase "and X is a permanent resident of the United States domiciled in state Q," such a rule would impose burdens far exceeding its benefits. We think it more efficient and more consistent with the statutory structure to indulge the assumption that an alien is domiciled outside the United States, and to leave it to the challenger to allege otherwise if there is reason to believe that the foreigner is a permanent resident who would destroy diversity. Contra *Woods–Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 951 F.Supp. 1028, 1030–31 (D.P.R.1996) (arguably requiring the jurisdictional allegation to negate the possibility the alien party was a permanent resident).

Here, Karazanos offered no reason to believe that any of the foreign citizen parties was in fact a permanent resident alien domiciled in Illinois. If he had wanted to explore that possibility, he could have asked the district court for permission to conduct a brief round of discovery on the issue of subject matter jurisdiction. Instead, he acquiesced in Hutchens's affidavit and left the allegation of foreign citizenship unchallenged. (Although we do not, of course, rely on the information outside the record, it may be worth noting that Madison Two's counsel represented during oral argument that the two "foreign citizen[s]" in the case were at all relevant times domiciled in the Cayman Islands and the United Kingdom.) We conclude, therefore, that the district court correctly decided that it had jurisdiction over this case under § 1332, and, like that court, we may proceed to the merits.

■ Karazanos's second point on appeal is again a technical one. He argues that in ruling on Madison Two's motion for summary judgment, the district court should not have taken into account an affidavit from David Lynch, Madison Two's past and present attorney, who provided evidence on certain material issues. According to Karazanos, by filing the affidavit Lynch violated Rule 3.7 of the Rules of Professional Conduct for the

Northern District of Illinois, which codifies the advocate-witness rule prohibiting lawyers from simultaneously acting as both trial counsel and witness on certain matters. See Rules of Professional Conduct for the Northern District of Illinois 3.7(a) (1997). Had that affidavit been stricken, Karazanos claims Madison Two's case for summary judgment would have collapsed.

We face at the outset a serious problem with Karazanos's argument: the lawyer representing Karazanos at the district court made no objection to the use of the affidavit, either on advocate witness grounds or on any other grounds. Arguments not made to the district court are waived on appeal, as we have said on countless occasions. Recognizing this, Karazanos has asked us to treat the district court's use of the affidavit as "plain error." That doctrine has no general application in civil cases like this one. *Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415, 421 (7th Cir.1996). Karazanos has not relied on Fed.R.Evid. 103(d), which does permit the court to take note of plain error in evidentiary rulings, nor has he suggested which of the Federal Rules of Evidence the district court's decision on the affidavit violated. In any event, even if Rule 103(d) applied, we see nothing that could be called plain error.

Assuming for the sake of argument that the affidavit was improper, no rule suggests that the only remedy for a violation of the advocate-witness rule is an order striking the affidavit. The court would be at least as likely to issue an order requiring counsel to withdraw from the case, so that the client could find a new lawyer and still have access to the necessary testimony. Rule 3.7(c) specifically says that "nothing in this Rule shall be deemed to prohibit a lawyer barred from acting as an advocate in a trial or evidentiary proceedings from handling other phases of the litigation." The commentary to Rule 3.7 plainly contemplates disqualification of the attorney as counsel as the sanction, not the disqualification of a witness that the client arguably needs. See *id.* cmt (1997). If the motion for summary judgment is another "phase" of the litigation that is neither a trial nor an evidentiary hearing, then perhaps Lynch did not even violate the applicable rules of professional conduct. Because of Karazanos's waiver of this point, we need not resolve these questions definitively. These observations simply show that this is not an attractive case for a general civil "plain error" doctrine even if there were one.

We come then, at last, to the merits of the appeal. This case at bottom is about a real estate lease. On March 20, 1979, Karazanos entered into a twenty-year lease with Madison Associates (later assigned to Madison Two) for certain premises located on the lobby level of the Three First National Plaza building in Chicago, which Karazanos was going to use for his restaurant. The lease was to run from October 1, 1982, to February 2, 2002. In March 1994, Madison Two sued in municipal court to evict Karazanos for failure to pay rent. Karazanos retaliated with a chancery action against Madison Two. In the meantime, Karazanos began discussions with a company called TEK Enterprises, which contemplated purchasing the restaurant. (There is some confusion about this name, which the district court had recorded as THE Enterprises; we have used the name as presented in Karazanos's brief.)

In the latter part of May 1994, Madison Two and Karazanos began settlement discussions for the two pending state court actions. Lynch, on Madison Two's behalf, sent a proposed stipulation to Karazanos's lawyer, Gregory Adamski, on May 17 and on May 23. Adamski responded on May 25 that the proposal would be acceptable if Madison Two would agree to several additional provisions, including one in which Madison Two would "agree to accept, in good faith, a buyer who is credit-worthy and who intends to operate a bar/restaurant of equal quality to Yiannis" before September 1, 1994. Lynch refused to accept the proposed new language, conceding only that Madison Two would, "consistent with its own best interest," consider anyone who wanted to operate a restaurant on the leased premises, including creditworthy candidates that Karazanos found. Madison Two specifically refused to "enter into any agreement" on that issue, citing its concern that vague agreements to act in "good faith" created "too many problems." When Adamski

reiterated his desire to include that clause, Lynch again refused because he felt such clauses "invite[d] litigation." The parties eventually agreed to settle their lawsuits, nevertheless, and the final stipulation was filed in municipal court on June 2, 1994. In exchange for immediate termination of the lease, rental payments for June and July 1994, Karazanos's vacation of the premises by July 31, 1994, and Karazanos's dismissal of the chancery court suit with prejudice, Madison Two agreed to waive its claim for $129,486 in past due rent. Notably, the stipulation did not contain a commitment by Madison Two to consider or give favorable treatment to potential lessees that Karazanos might propose.

Sometime before the parties entered this stipulation, Lynch received a copy of a letter of intent setting forth the terms of Karazanos's sale of its business to TEK. On May 31, 1994—the day the stipulation was signed—Adamski and Lynch met to discuss TEK's expected purchase. Karazanos alleges that Lynch agreed at that meeting that Madison Two would deal with its purchaser in "good faith." After the stipulation was signed, Lynch forwarded the letter of intent to Madison Two, and on June 6, 1994, a representative of Madison Two met with Lynch, Karazanos, Adamski, and TEK representatives to discuss a new lease for TEK. After that meeting, Lynch filed the stipulation to dismiss the chancery suit. TEK met a second time with Madison Two after which Madison Two sent it a proposed ten-year lease. However, TEK found Madison Two's base rental demand of $27 per square foot "outlandish" because it was more than twice what Karazanos had paid. TEK rejected the lease and in the end did not purchase Yiannis, which folded on July 31, 1994. Karazanos now claims that Madison Two dealt with his proposed successor, TEK, in bad faith.

■ Recognizing that the written stipulation between Karazanos and Madison Two did not contain any obligation on Madison Two's part to prefer or otherwise to deal with replacement lessees offered by Karazanos, the plaintiffs have tried to find some theory under which an oral contract or its equivalent existed that would have the same effect. After considering the plaintiffs' testimony regarding the supposed oral contract, the district court ruled that the stipulation was an integrated document that could not be varied by parol evidence. In so doing, the court erroneously followed Illinois's version of the Uniform Commercial Code, even though the stipulation related to a real property lease, not a sale of goods. Compare *Yiannis, Inc.*, 1996 WL 680239, at *34 with *Lake County Trust Co. v. Two Bar B, Inc.*, 238 Ill.App.3d 589, 179 Ill.Dec. 426, 606 N.E.2d 258, 264 n. 3 (1992) and 810 ILCS 5/2–102 (West 1998) (applicability of Article 2 to sale of goods) and 810 ILCS 5/9–104(j) (West 1998) (inapplicability of Article 9 to interests in real property including leases). It should have looked instead to general Illinois contract law, under which the Illinois Supreme Court has held that "in cases not governed by the Uniform Commercial Code (UCC) ... only the subject writing may be considered to determine the integration question." *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill.2d 265, 205 Ill.Dec. 98, 642 N.E.2d 1215, 1218 (1994). The stipulation does not have a formal integration clause, nor does other language in the agreement appear to exclude entirely the possibility of parol evidence that would support consistent additional terms in the agreement.

■ In the end, however, this does not help Karazanos under any of his contract theories: parol evidence supplementing the written agreement; a separate and independent oral agreement; a unilateral contract offered by Madison Two that Karazanos accepted by performance; a contract implied-in-fact from the parties' course of dealing; or promissory estoppel. All of these arguments falter on the same point: there is absolutely nothing in the record from which a reasonable trier of fact could find that Madison Two thought there was an understanding between it and Karazanos that somehow obligated it to deal with Karazanos's prospective lessees. As the district court found, Karazanos's unilateral, subjective expectation that Madison Two was so bound is not enough to support recovery under any of these contract or quasi-contract theories. Indeed, given the histo-

ry of the negotiations between the parties, the one thing that should have been plain to Karazanos was that Madison Two had refused to undertake any such obligation. The fact that Madison Two did not slam the door in TEK's face when Karazanos wanted to introduce the TEK representatives to it does not mean that Madison Two thought it was obligated in any way to either TEK or to Karazanos. As Lynch had said, Madison Two had no objection to meeting prospective tenants introduced by anyone, including Karazanos, but it was not making any promises to act in "good faith" or otherwise to favor Karazanos's candidates. On these facts, no jury could find that such a clause was part of the written stipulation, that an oral contract of any kind existed between the parties, or that Karazanos reasonably relied on a promise made by Madison Two that gave rise to promissory estoppel.

We conclude that the district court had subject matter jurisdiction and that it correctly granted summary judgment for Madison Two. The judgment of the court is therefore AFFIRMED.