In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1117

INTEC USA, LLC,

*Plaintiff-Appellant,*

*v.*

JONATHAN ENGLE, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 6171—**Suzanne B. Conlon**, *Judge.*

ARGUED SEPTEMBER 12, 2006—DECIDED NOVEMBER 2, 2006

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* An arbitration between Intec USA and a group of corporations controlled by Raph Engle was settled in 2003. Engle had founded Intec in 1990 and sold a majority interest in 1997. Intec's new investors maintained in the arbitration that Engle's other ventures (IBEX Industries Ltd. and related firms) were violating covenants not to compete that Engle had given in order to induce them to buy out his interest in Intec. The 2003 pact appeared to resolve that dispute. After concluding that Engle and his firms were not paying any more attention to the 2003 agreement than to the 1997 covenants, Intec filed suit in North Carolina, its home state. The 2003 settlement specifies that North Carolina's law will govern but does not include a provision consenting to litigate there.

Engle is a citizen of New Zealand, as are three of the seven corporate defendants. Of the remaining corporations, two are citizens of Australia and one each of Brazil and the United Kingdom. They do not do business in North Carolina and denied that its courts have personal jurisdiction over them.

Before the court acted on the defendants' motion in North Carolina, Intec filed a new suit in Chicago, where it served Jonathan Engle (Raph's son) and the family corporations with process during a trade show for the food-processing industry, in which both Intec and the Engle businesses compete. The district court dismissed this suit on the ground of *forum non conveniens.* 2005 U.S. Dist. LEXIS 33365 (N.D. Ill. Dec. 13, 2005). See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702 (7th Cir. 2005). North Carolina might be a convenient forum (if the problems with personal jurisdiction could be solved), and New Zealand might be a convenient forum, but Chicago had nothing to do with the parties or their dispute, the court concluded. As between Chicago and New Zealand, the district court thought, New Zealand is the more appropriate forum: only two of Intec's potential 18 witnesses, and none of the defendants', lives within the range of compulsory process under Fed. R. Civ. P. 45(b)(2), (c)(3). Many more potential witnesses can be compelled to appear in New Zealand than in Chicago. All of the defendants have consented to be sued in New Zealand, the base of the supposedly forbidden activities. Most if not all of the physical evidence is there. The district judge stressed that, as Intec wants an injunction, it is appropriate for the court that issues an injunction to have the on-the-spot ability to supervise compliance and provide supplemental relief.

Intec's appeal principally rests on the proposition that the plaintiff's choice of forum should be respected in all

but extraordinary cases. See *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508-09 (1947). We doubt that this proposition has controlling force in litigation among firms all of which trade worldwide. See *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 804 (7th Cir. 1997). Intec has an affiliate (Intec Pacific) in Oceania, and the materials-handling business is international; it is not as if a person with no dealings outside the Great Plains were being dragged halfway around the world to litigate. Intec says that, because its claims rest on U.S. law, this nation should do the enforcement to protect domestic firms. Why courts should favor their citizens in court—and why the first litigant to reach a courthouse should receive this benefit (if it is one)—are mysteries. International business transactions depend on evenhanded application of legal rules; home-town favoritism is the enemy of commerce.

As a nation whose policy favors free international trade, the United States must be prepared to trust the judiciary of our partners, unless there are grounds to doubt the competence or honesty of the foreign judicial system. See *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) (enforcing agreement to litigate in London); cf. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (enforcing agreement to arbitrate in Japan). Intec does not offer any reason to think that New Zealand would be a biased forum for this litigation. North Carolina law is "foreign" even to a federal court in Chicago (or for that matter North Carolina). Under *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), the federal court's task is not to made an independent decision but to predict how the Supreme Court of North Carolina would understand and apply its own law. New Zealand would try to do the same. Just as federal courts routinely enforce the laws and judicial decisions of other jurisdictions, so do the courts of other nations. See *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600 (7th Cir. 1994). Intec has not cited any decision imply-

ing that New Zealand is unwilling to enforce choice-of-law clauses that specify other jurisdictions' norms or that it is hostile to any of the substantive rules of North Carolina's law. (Indeed, counsel for Intec revealed at oral argument that he has done no research and hasn't a clue how New Zealand handles disputes that arise out of international trade.)

Before we decide just how much weight to give to the plaintiff's choice of forum, however, we must attend to subject-matter jurisdiction, for if there is none then the suit must be dismissed without regard to whether Chicago would be the most convenient forum. It is an open question whether a district court may dismiss on *forum non conveniens* grounds without deciding whether it has subject-matter jurisdiction. See *Malaysia International Shipping Corp. v. Sinochem International Co.*, 436 F.3d 349 (3d Cir. 2006), cert. granted, 2006 U.S. LEXIS 5422 (Sept. 26, 2006). The majority in *Sinochem* concluded that jurisdictional issues always must be resolved ahead of all others. It relied principally on *Steel Co. v. Citizens for A Better Environment*, 523 U.S. 83 (1998), and *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999), for the proposition that "jurisdictional" decisions must precede all others. Judge Stapleton replied in dissent that there are many reasons for *not* adjudicating—lack of subject-matter jurisdiction, lack of personal jurisdiction, lack of ripeness, abstention, and *forum non conveniens*, among others. He maintained that jurisdiction is vital only if the court proposes to issue a judgment on the merits. *Ruhrgas* says as much, 526 U.S. at 584-85, though in dictum. (Its holding is that there is no priority between subject-matter jurisdiction and personal jurisdiction.)

Judge Stapleton's view is the norm among federal appellate courts. See, e.g., *Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002); *In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998). It seems to us

the right approach; we expect *Sinochem* to turn *Ruhrgas*'s dictum into a holding. Unlike the majority in *Sinochem*, we do not read *Kamel* as committing this court to a rule that subject-matter jurisdiction always must be resolved ahead of *forum non conveniens*. But to avoid the need for further proceedings should the Supreme Court affirm in *Sinochem*, we turn to subject-matter jurisdiction. This is prudent in any event, because Intec may be tempted to try still a third federal forum (perhaps at the next trade show in Las Vegas), and if subject-matter jurisdiction is absent that maneuver must fail.

Intec is a limited liability company, which has the citizenship of each of its members. See *Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998); cf. *Carden v. Arkoma Associates*, 494 U.S. 185 (1990) (all associations other than corporations have the citizenship of each partner or member). Intec has five members, all natural persons, and it alleged that all five are citizens of North Carolina. Yet one of them, John Smith, is a citizen of New Zealand. It is common ground among the parties (at least, it *became* common ground once we directed them to file supplemental memoranda after oral argument) that, if Smith is treated as a citizen of New Zealand, then Intec is a citizen of both North Carolina and New Zealand. Subject-matter jurisdiction then would be lacking, first because citizens of New Zealand would be on both sides (so complete diversity, see *Strawbridge v. Curtiss*, 3 Cranch 267 (1806), would be missing), and second because 28 U.S.C. §1332(a)(2) does not in any event extend to litigation in which all of the litigants are aliens. See *Hodgson v. Bowerbank*, 5 Cranch 303 (1809); *Mossman v. Higginson*, 4 Dall. 12 (1800). (For this purpose Intec would be "an alien" in the same sense that a firm incorporated in Delaware, with its principal place of business in North Carolina, is a citizen of both states.)

Intec rests its position on the trailing, unnumbered sentence in §1332(a): "For the purposes of this section,

section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled." Smith's immigration status is that of an alien "admitted to the United States for permanent residence", so this clause applies to him. But what does it mean? It could mean that a permanent-resident alien "shall be deemed a citizen [exclusively] of the State in which such alien is domiciled." Or it could mean that the alien "shall be deemed a citizen of the State in which such alien is domiciled [in addition to his foreign citizenship]." If the former, then Intec is a citizen of North Carolina only, and federal jurisdiction is proper; if the latter, then Intec has dual citizenship, and subject-matter jurisdiction is missing.

The first appellate court that addressed the issue thought that the language is "plain" and admits only of the former meaning: a permanent-resident alien is deemed to be a citizen of the state where he is domiciled, and not of his native nation. *Singh v. A.G. Daimler-Benz*, 9 F.3d 303 (3d Cir. 1993). The court recognized that the language originated in a proposal to the Judicial Conference of the United States, which asked Congress to enact it as a means to curtail diversity jurisdiction. See *Report of the Proceedings of the Judicial Conference of the United States* 76-77 (Sept. 14, 1988). Without this "deemer" clause, federal jurisdiction would extend to a suit between a citizen of North Carolina and his next-door neighbor, who happened to be a citizen of New Zealand even though admitted for permanent residence and domiciled in North Carolina. The Judicial Conference thought that an unnecessary and unwise use of the limited federal adjudicatory capacity. Senator Heflin, a member of the Federal Courts Study Committee, introduced this language as part of a package of uncontroversial amendments, which immediately passed without discussion. 134 Cong. Rec. 31,050 (1988); *id.* at 31,054 (Senator Heflin's section-by-section analysis showing this language's

derivation); *id*. at 31,067 (passed by unanimous consent). But this background is irrelevant, *Singh* thought: the statute is plain, and when the text is clear legislative history doesn't count. See, e.g., *Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 125 S. Ct. 2611, 2625-27 (2005).

Yet this statute is not self-contained. It does not say whether the deemed citizenship replaces, or adds to, the alien's actual citizenship; it needs something more, such as the language in brackets in our two possible completions. Moreover, the background of this amendment is not the sort of legislative history that committees or individual Members of Congress slip into the record late at night. The provenance of language, such as the fact that one or another clause was amended in response to a judicial interpretation that the sitting Congress wanted to alter, differs from a potentially self-serving gloss put on language by a Member or a committee. See *Rivers v. Roadway Express, Inc*., 511 U.S. 298 (1994).

Any text takes color from the circumstances that produce it. When these circumstances precede the legislative process and are objectively ascertainable by every legislator and judge, no interest group has an opportunity to slant interpretation in its favor by putting spin on language that other people would understand quite differently. Even those Justices resolutely opposed to reliance on what Members or committees say about a text while it is under consideration see no problem using history of this kind to decode an ambiguity. E.g., *Jones v. R.R. Donnelley & Sons Co*., 541 U.S. 369, 377-83 (2004) (unanimous opinion tracing the steps that led to 28 U.S.C. §1658); *West Virginia University Hospitals v. Casey*, 499 U.S. 83, 92-97 (1991) (interpreting a statute in light of the way courts had interpreted similar language before the new law's enactment).

It is possible to imagine complications. Suppose, for example, that Senator Heflin had announced that he

understood the language to accomplish something other than the Judicial Conference's objective, and that the House had voted for the bill in ignorance of the Senator's view. Cf. *Continental Can Co. v. Chicago Truck Drivers Pension Fund*, 916 F.2d 1154 (7th Cir. 1990) (discussing how to proceed when Members of the two Chambers put incompatible spins on statutory text). But that's not what happened.

When the meaning of this sentence in §1332(a) came under appellate consideration a second time, the court held that the law's genesis could be considered. Because it unambiguously shows that the text's function is to add a (deemed) domestic citizenship to an alien who otherwise would come within the jurisdiction under §1332(a)(2) or §1332(a)(3), the court rejected *Singh* and held that the alien retains his national citizenship for purposes of §1332(a). See *Saadeh v. Farouki*, 107 F.3d 52 (D.C. Cir. 1997).

No appellate court has returned to the subject in detail since *Saadeh*. In passing, however, we cited *Saadeh* and remarked this language gives every permanent-resident alien two citizenships. *Karazanos v. Madison Two Associates*, 147 F.3d 624, 627 (7th Cir. 1998). See also John B. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue: The Judicial Improvements Acts of 1988 and 1990*, 24 U.C. Davis L. Rev. 735, 741-45 (1991). Intec observes that the question had not been briefed in *Karazanos* and it asks us to revisit the subject in light of *Singh*, which *Karazanos* did not mention. Fair enough. We have reconsidered—and, for reasons that by now should be apparent, we conclude that *Singh* is wrong and *Karazanos* right.

Whether *Saadeh* also is right is a more difficult question. The D.C. Circuit stated that the 1988 amendment should be understood so that it always defeats diversity jurisdiction.

107 F.3d at 57-58. Yet on the reading we adopted in *Karazanos* (and reaffirm today) the 1988 amendment could support jurisdiction. Suppose A is a citizen of Mexico admitted for permanent residence and domiciled in California, B a citizen of New York, and C a citizen of Canada. Under pre-1988 law, A could sue B under 28 U.S.C. §1332(a)(2) (which provides jurisdiction over suits between "citizens of a State and citizens or subjects of a foreign state") but could not add C as a defendant, because then aliens would be on both sides, and would not come within §1332(a)(3) (which provides jurisdiction over suits between "citizens of different States and in which citizens or subjects of a foreign state are additional parties"). After the 1988 amendment, however, the imputed state citizenship of A would bring the suit A v. B and C within §1332(a)(3).

That may be a rare occurrence, but having selected the best reading of the text (that permanent-resident aliens have both state and foreign citizenship) a court should be willing to follow through logically. The belief behind the drafting choices made in 1988 was that dual citizenship usually would move cases to state court (as does dual corporate citizenship), but like other language it may have unanticipated effects at the fringes. See, e.g., *Dodd v. United States*, 545 U.S. 353 (2005). Congress passed, and the President signed, concrete language, not the Judicial Conference's raw intent or expectations. Cf. *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358 (7th Cir. 1987).

Intec loses under both our reading and the D.C. Circuit's, however. Its suit against these defendants cannot proceed in any federal court. The judgment of the district court is vacated, and the case is remanded with instructions to dismiss for lack of subject-matter jurisdiction.

A true Copy:

      Teste:

                _____

                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*